## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ALL AMERICAN OIL & GAS | § | Case No. 18-52693-rbk |
| INCORPORATED, *et al.*,[1] | § | |
| | § | |
| Debtors. | § | **Joint Administration Requested** |
| | § | |

## DECLARATION OF PATRICK R. MORRIS,
## PRESIDENT OF ALL AMERICAN OIL & GAS INCORPORATED,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Patrick R. Morris, hereby declare under penalty of perjury:

1.      I am the President of All American Oil & Gas Incorporated ("AAOG"), a corporation organized under the laws of Delaware and the parent company of Western Power & Steam, Inc. ("WPS") and Kern River Holding Inc. ("KRH" and together with AAOG and WPS, the "Company" or the "Debtors").[2] I have been employed as the President of AAOG since November 2016.  Before becoming President, I joined AAOG in 2014 as the Vice President of North American Investor Relations and was subsequently promoted to Executive Vice President. I hold a Juris Doctor, magna cum laude, from New York Law School, a Master of Arts from Emerson College and a Bachelor of Arts from Syracuse University.  I have over 20 years of experience in finance and investment research, energy services and exploration and production.

2.      On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

---

[1]     The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number are: All American Oil & Gas Incorporated (5894); Kern River Holdings Inc. (0508); and Western Power & Steam, Inc. (2088). The location of the Debtors' service address is: 9601 McAllister Freeway, Suite 221, San Antonio, Texas 78216.

[2]     I am also the Assistant Secretary, Assistant Treasurer and an authorized signatory of each of KRH and WPS.

Code") with the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court"). To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings seeking the use of cash collateral and other various types of "first day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.

3.      I am generally familiar with each of the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' employees and operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      This declaration has been organized into five sections. The *first* provides background information on the Debtors' businesses and operations.[3] The *second* offers detailed information on the Debtors' current financial condition. The *third* describes the events leading to the filing of these chapter 11 cases (the "Chapter 11 Cases"). The *fourth* describes the Debtors'

---

[3] Many of the financial figures presented in this declaration are unaudited and potentially subject to change but reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

motion seeking authority to use cash collateral to fund their Chapter 11 Cases and operations going forward. The *fifth* summarizes the relief requested in, and provides the legal and factual bases supporting, the First Day Motions.

**Executive Summary and Recent Developments Precipitating the Chapter 11 Filing**

5.      AAOG is an independent oil company headquartered in San Antonio, Texas. AAOG holds, and provides shared administrative and accounting services to, its two wholly-owned subsidiaries: KRH and WPS. KRH is an exploration and production ("E&P") company that utilizes a state-of-the-art steam flood to extract oil within a 215-acre leasehold, with 110 acres currently under steam flood, in the Kern River Oil Field.[4] WPS is a power company that operates a 20-megawatt cogeneration facility located  adjacent to KRH, which—in addition to selling power to Pacific Gas & Electric ("PG&E")—provides KRH with both electricity and steam (generated from waste heat) to aid KRH's extraction of oil.

6.      KRH is the rare E&P company that has successfully weathered the great disruptions in the oil and gas market of the last several years and was able to refinance and maintain profitability while running a lean and efficient operation consisting of only eight on–site employees, many of whom have worked together for decades.   A November 10, 2018 preliminary valuation performed by Houlihan Lokey ("Houlihan") estimates the Company's total enterprise value at $175 million to $195 million. KRH is cash flow positive—with approximately $25 million in EBITDA in 2017 and a similar, but slightly higher EBITDA projected for 2018—and is current on all obligations to unsecured creditors. AAOG and WPS are similarly cash flow positive and current on their unsecured debt.

---

[4] A short history of the Kern River Oil Field is attached as **Exhibit A**, "Steamflooding Keeps California Field Producing 117 Years Later," and recounts how large quantities of heavy oil have been produced making this one of the top five U.S. oil fields.  Unlike typical Texas oil fields, due in part to the technology employed with steam flooding, the useful producing life of Kern River Oil wells is far longer, stretching over many decades.

7.      KRH is the borrower on an $87.6 million first lien credit facility (the "First Lien Facility") and a $50 million second lien credit facility (the "Second Lien Facility" and together with the First Lien Facility, the "Credit Facilities"), both of which were issued by a fund of Alliance-Bernstein ("AB") in September 2016 and August 2015, respectively, and are due on December 31, 2019 and June 30, 2020, respectively.  AAOG and WPS are each guarantors of these Credit Facilities.  Given its strong financial performance, and the substantial increase in oil prices from when it entered into these loans, KRH anticipated refinancing its Credit Facilities over the next 14 months, in advance of their scheduled maturities, as it has repeatedly done in the past.  It was forced to change that plan, however, when newly created Kern Cal Oil 7 LLC ("KCO7"), which, upon information and belief, is an affiliate of Grade 6 Oil, LLC ("Grade 6"), itself a newly created company, acquired the Company's secured debt from AB in mid-October 2018.

8.      From the outset, KCO7 did not act as a typical lender but began to implement a predatory "loan to own" strategy.  This culminated in the written declaration of a covenant default delivered to two AAOG Board members, myself and the Company's general counsel only minutes into the meeting that KCO7 had called to discuss purchasing the Company's operating assets, and before KCO7 had even closed on the purchase of the secured debt.  KCO7's principals include two former investment bankers (Cary Meadow and Paul Kromwyk) who were fired allegedly for cause from AAOG's and KRH's former investment banker and financial advisor Cappello Capital Corporation ("Cappello").[5]

---

[5] *See* Statement of Claim, *Cappello Capital Corp. v. Meadow*, (FINRA Apr. 17, 2015), attached hereto as **Exhibit B** against Cary Meadow and Paul Kromwyk for breach of fiduciary duty, misappropriation of confidential information, and fraud, among other allegations.  In addition to the specific allegations concerning the above actions, none of which mention AAOG, Cappello asserts that Messrs. Meadow and Kromwyk have "repeatedly and systematically, without permission, taken, copied, or made use of Claimants data" relating to Cappello's engaged and prospective clients (Par. 71).  *See also Cappello Group, Inc. v. Meadow*, No. B284256, 2018 WL 4103187, at *1 (Cal. Ct. App. 2d Dist. Aug. 29, 2018) ("While working at Cappello, Meadow allegedly used Cappello's employees and resources

4

9. While at Cappello, Mr. Kromwyk, now Grade 6's CFO, was substantially involved in the representation of AAOG and intimately involved in certain of our prior refinance efforts. While a director at Cappello, Mr. Kromwyk (and presumably Mr. Meadow) had complete access to all of the Company's confidential information, reserve reports, business plans and had regular and substantive communications with our employees and management team. Based, I believe, on the insights gained from access to the Company's confidential materials and inside information, Messrs. Kromwyk and Meadow, having left Cappello, and first acting as principals of Grade 6 Oil—approached the Company in August 2018 while doing diligence on their anticipated AB debt purchase. During the parties' initial conversations, they stated to me and others in my presence their belief that AAOG's equity was worthless—a belief premised on the fact that AB was allegedly willing to sell its debt at a discount. They also stated that they (and their still unidentified investor) had no real interest in being a lender to the Company but rather intended to use their debt interest to acquire the Company and its assets. In early October—about two weeks before their purchase of AB's debt would close—the KCO7 principals began to execute on their strategy, proposing an (unworkable) sale transaction for little to no value to the AAOG shareholders.

10. AAOG could not—and did not—accept a proposal providing no meaningful return to its shareholders. But AAOG's Board and I did not foreclose the possibility of pursuing a transaction on terms fair to its shareholders. Rather, AAOG stated that it was ready and willing to negotiate a fair purchase price for its equity and to submit any agreement to a shareholder vote, and AAOG proposed an alternative transaction structure and price. Seemingly willing to engage in fair negotiations, KCO7's principals requested an in-person meeting with AAOG's

to divert business opportunities from Cappello to Meadow's own company"). We do not at this time know if the specific data relating to our Company was taken, or just accessed when Mr. Kromwyk was extensively working on our matters for several months before he was terminated.

5

Chairman and CEO, purportedly to discuss price and terms and respond to AAOG's counteroffer. This meeting, which I attended, took place in New York on October 17, 2018. But the meeting was not part of good faith negotiations over price and terms. Instead, KCO7—which had not yet even closed on the AB debt—opened the meeting by handing AAOG's CEO a notice of default, claiming that KRH was insufficiently hedged and that KCO7 had elected to charge default interest at an additional 2% for the First Lien Facility and an additional 3% for the Second Lien Facility above the floating rate of the loans. While we had previously discussed with KCO7's principals their general view that hedging was important, they never told us that they believed that KRH had failed to properly engage in hedging transactions, or that they believed the loan was in default. And more important, we had discussed the history of consensual hedging with our prior lenders AB, which had always agreed that KRH was appropriately hedged. In fact, AB had never threatened, much less issued, a notice of default for insufficient hedging. I believe that this meeting—with its orchestrated default notice—was a transparent attempt to intimidate AAOG into handing over the Company to KCO7 for little or no value to its shareholders.

11.     AAOG remained committed to maximizing its total enterprise value and preserving the existing shareholder equity value. AAOG therefore sought to engage with KCO7 in good faith to address the purported event of default and to discuss whether the parties could agree upon a fair value for AAOG's stock. First, AAOG requested that KCO7 rescind the Notice of Default, as that notice itself created a significant impediment to implementing new hedges. In addition, at my direction, David Katz, our General Counsel, contacted BP Energy Company ("BP") and Shell Trading Risk Management, LLC ("Shell"), KRH's current and longstanding hedging counterparties, to discuss the pricing and terms of putting additional hedges in place. BP

informed us that, because KCO7 had not yet provided the requisite thirty (30)-day notice of a change of collateral agent under the funded debt, BP would not enter into new hedges with KRH. Shell's hedging personnel had not yet received notice or documentation with respect to the KCO7 debt purchase and also informed the Company that, due to outstanding litigation claims asserted by the Company against Shell, additional clearance would have to be first obtained before new hedges could be put into place. We conveyed this information to KCO7 and explained that, until KCO7 complied with the requisite notice requirements, the Company was not likely to be in a position to place new hedges. We also reiterated to KCO7 that, unless the event of default was rescinded, the hedge counterparties would have to be made aware of the declaration of default, which would likely result in either a further delay and/or a refusal to entertain new hedges.

12.     Because of the importance of valuation to these discussions, and in order to update a two-year-old equity valuation,[6] the Company first requested that KCO7 pay for an updated valuation analysis. When KCO7 refused, the Company determined to retain Houlihan to conduct a current valuation of their assets. Houlihan conducted its own detailed review and has preliminarily concluded that the Company's equity value is currently between $35 and $55 million in excess of the secured and unsecured debt. We have asked Houlihan to prepare an expert report to submit to the Bankruptcy Court at the appropriate time.

13.     The Company and KCO7 held another in-person meeting in New York on November 7, 2018, to discuss both the current disputes with respect to hedging and the default declaration, and the price and terms for a potential KCO7 acquisition, and shared with KCO7 Houlihan's enterprise valuation range for the Company's assets. Unfortunately, the November 7

---

[6] The Debtors obtained a third party valuation of AAOG's per share equity value in October 2016, which was recently provided to KCO7 upon their request and entry into a non-disclosure agreement.

discussions ended without any resolution of the alleged defaults or realistic prospect of an agreed transaction, as KCO7 and the Company continue to hold highly divergent views as to the Company's value.

14. KRH was scheduled to make an interest payment to KCO7 the day after the November 7 meeting. KCO7 had informed KRH that KCO7 would be charging default interest based on its prior notice of default with respect to hedging, and that, unless a resolution was reached, KCO7 would begin exercising remedies. In light of KCO7's position that the Company's equity is worthless, and given that any consensual out-of-court refinancing of KCO7's position would be difficult—and likely impossible—due to KCO7's asserted defaults, the Company determined that making the interest payment under the present circumstances jeopardized both the Company's short-term ability to meet its going concern obligations and its long-term ability to maximize the value of its businesses for all of its stakeholders. After significant deliberations, the Company thus decided to file these cases to protect its going concern enterprise value and to restructure its secured debt.

## Background of the Company's Businesses and Operations

### I. Overview of the Company's Business

#### A. The Company's Assets and Operations

15. KRH operates as an independent oil company engaged in E&P activities in onshore U.S. oil properties on approximately 215 acres of land in Kern County, California. WPS is a small power company that operates a 20-megawatt cogeneration facility located adjacent to KRH, which—in addition to selling power to PG&E—provides KRH with both electricity and waste heat to generate and supply steam to aid KRH's extraction of oil. AAOG wholly owns, and provides shared administrative and accounting services to, KRH and WPS. The Company operates symbiotically to enhance its overall production output and value.

## 1.    KRH'S Assets and Operations

16.    KRH owns and operates six oil leases with approximately 124 producing wells, 43 steam injection wells and 15 observation wells.[7]   KRH's oil leases are on the southwest edge of the giant Kern River Oil Field, which has produced almost 3 billion barrels to date. The heavy oil that lies under this field can only be produced in economic, commercial quantities through the injection of steam, which heats up the oil, reducing its viscosity and allowing it to flow to the producing wells.

17.    By virtue of its location and infrastructure, KRH enjoys significant competitive advantages in the E&P industry, including a high recovery rate, a high per-well producing rate and a shallow decline rate, a "downdip" field location, the presence of numerous stacked oil sand pay intervals with relatively thin impermeable siltstone intervals in between, state of the art technology and production methods, the ability to transport its production from its leases to the San Pablo Bay Pipeline[8] through a LACT (lease automatic custody transfer) unit, the agreement of its leaseholders to lease and pooling agreements and significant non-producing reserves.

18.    **Recovery Factor**: The Kern River Oil Field, which began producing in the late 1800s, is projected to have a high recovery factor as compared to other fields. A recovery factor is the recoverable amount of hydrocarbon initially in place, normally expressed as a percentage.[9] Typically, heavy oil properties like KRH see a higher estimated recovery factor, usually at 60+%. For comparison, conventional light oil reservoirs are in the 25% to 40% recovery range,

---

[7] The following link shows the WPS facility from aerial satellite with Google Earth.  KRH's oil field is directly to east of the WPS facility and continues south.  https://earth.app.goo.gl/jWK3fM

[8] This pipeline allows KRH to transport its oil to refineries in Northern California.  Since 2014, KRH has at different times sold its oil on an exclusive basis to each of Shell Oil (defined below), Tesoro, and Chevron.

[9] Schlumberger Oilfield Glossary, available at,
https://www.glossary.oilfield.slb.com/en/Terms/r/recovery_factor.aspx

and "light and tight" unconventional oil reservoirs (shale) are in the 5% to 20% recovery range.[10] The EPA has projected that the Kern River Oil Field will eventually produce an estimated 80+% of the original amount of oil and will be doing so over the course of another 35 years.[11] Thus, our properties' projected recovery rate is high even when compared to otherwise comparable heavy oil properties.

19.     **High Production and Shallow Annual Decline Rates**: The KRH assets have, relative to other oil properties, a high per-well producing rate and a very shallow annual decline rate. This results in long reservoir life and a high number of barrels of oil per well to still be produced and stands in marked contrast to unconventional shale oil reservoirs (e.g., the Texas Permian and Eagle Ford reservoirs), which have very high initial production rates but relatively short well lives. Production is currently 19 barrels of oil per day per well, and the assets are expected to produce until approximately 2039.[12]

20.     **Downdip Field Location**: The KRH leases are "downdip" of other leases within the Kern River Oil Field. This "downdip" positioning allows KRH to benefit from the gravity drainage of the oil (i.e., it allows for the flow of oil from adjoining properties owned by other

---

[10] *See generally* Ann Muggeridge et al. *Recovery Rates, Enhanced Oil Recovery and Technological Limits* (Jan. 13, 2014) (explaining why the average oil recovery factor worldwide is only between 20% and 40% and describing the factors that contribute to these low recoveries and which of those factors enhanced oil recovery techniques can affect), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3866386/.

[11] A 2017 EPA letter regarding the life of the Kern River Oil Field stated that it has projected life of another 35 years. Letter of the United States Environmental Protection Agency ("EPA"), August 30, 2017, at p.4, available at, https://www.epa.gov/sites/production/files/2017-09/documents/epa_letter_and_record_of_decision_to_doggr-20170830.pdf.

[12] "Over 17% of California oil production in 2008 was produced from stripper wells—defined by the California Department of Oil, Gas, and Geothermal Resources as wells producing less than 10 barrels per well per day. Some 59% of operating wells in California are now classified as stripper wells." Adam R. Brandt, *Oil Depletion and the Energy Efficiency of Oil Production: The Case of California* (Oct. 12, 2011), at § 2.3 (citing CDC-DOGGR. 2008 Annual Report of the State Oil & Gas Supervisor; Technical report; California Department of Conservation, Division of Oil, Gas and Geothermal Resources), available at https://www.mdpi.com/2071-1050/3/10/1833/htm. KRH currently sells oil to Chevron at a $1.80/barrel premium to the Midway Sunset average price due to a shortage of Kern River crude (caused by the decision in late 2014 by the Kern River Field's largest operator, Chevron, significantly to cut back on production due to lower oil prices), which is likely to persist in the intermediate term.

operators onto KRH's properties), ultimately increasing over time the amount of oil that can be extracted from KRH's properties.

21. **State of the Art Technology**: KRH employs state of the art technologies and production methods that will continue to lead to higher recoveries, including:

(i) automatic variable speed drives on the pumping units and a casing vent recovery system, both of which lead to low back pressure against the producing wells and optimum oil recovery;

(ii) a field wide computerized well gauging and monitoring system, which leads to a relatively quick response as problems are identified;

(iii) "super-heated" steam purchased from its sister company, WPS, which (a) results in a higher steam quality, which in turn provides for better transfer of heat to the reservoir and (b) allows KRH to operate its own steam generators more efficiently, thereby increasing their lifespans;

(iv) advantageous natural gas pricing resulting from the ownership of the WPS assets.

(v) full compliance with recent changes in the regulations that have allowed KRH to reopen Critical wells[13] near residential structures; and

(vi) recent completion of three water disposal wells to bring KRH into full compliance with both the Division of Oil, Gas and Geothermal Resources ("DOGGR") and EPA wastewater rules.

22. **Stacked Oil Sand Pay Intervals**: The Kern River Oil Field consists of numerous stacked oil sand pay intervals with relatively thin impermeable siltstone intervals in between. KRH, which employs steam flood operations, takes advantage of the Kern River Oil Field's stacked oil sand pay intervals by using a relatively new technology to process several sand intervals at one time, using downhole packer ("limited entry") assemblies that allow for a precise distribution of steam, leading to a higher present value than what could otherwise be achieved if the sands had to be processed one at a time. This process allows KRH to achieve high recoveries within each individual oil sand, ultimately increasing overall production and ultimate recovery.

---

[13] Critical wells are defined by the DOGGR as those wells within (i) 100 feet of a road or park or (ii) 300 feet of a home or occupied structure. *See* https://www.ccair.org/the-policy-lesson-of-aliso-canyon/

23. **Use of a LACT Unit**: KRH benefits from its 2016 investment in a LACT (lease automatic custody transfer) unit, a unit which facilitates the accurate measuring of the volume and quality of the oil KRH produces as it is transferred by automated means from KRH to a common carrier pipeline. The use of a LACT significantly reduces KRH's transportation costs. The pipeline corridors efficiently collect production and casing-vent gases and distribute steam in insulated lines to each automatic well test site.

24. **Lease and Pooling Agreements**: Unlike many similarly situated E&P companies, KRH is a party to certain lease and pooling agreements that permit KRH to pool oil production from five of its six mineral leases.[14] This allows KRH to process the produced oil from those mineral leases in one common facility, saving KRH significant capital and benefitting both the working interest owners, through reduced costs, and the mineral interest owners, through encouraging greater development of the asset with zero expenditure. Each lease receives a percentage of production from the pooled production based on its percentage of total acreage under production on the leases.

25. **Reserves**: KRH has significant reserves that are not yet being produced. For instance, because there are physical limitations on how many downhole packers can be utilized at any given time to process stacked oil sand pay intervals, KRH is not currently steam flooding all of its oil-bearing sands. As a result, KRH has significant "behind pipe" (Proven Developed Non-Producing, or PDNP) reserves available that will be developed in the future at a very low capital cost per barrel as new wells do not have to be drilled to access these reserves. KRH also has significant Proven Undeveloped ("PUD") reserves that have significant value with respect to future production. Of the 215 acres under leasehold, KRH is currently steam flooding and

---

[14] The sixth mineral lease, known as the "Nukern", has its own separate facilities. Of the five pooled leases, two are currently non-producing and KRH pays a "Shut-in Royalty Payment" to the mineral interest holder to prevent the mineral lease from terminating.

producing 110 acres. Additionally, KRH has recently undertaken a program of horizontal drilling to assist in the recovery of oil, similar to a successful program employed by Chevron USA, KRHs offset operator.

26. **Recent Reduction in Production:** KRH has had a recent temporary decrease in production, due to the following three factors.

27. First, an enhanced oil recovery steam floods need to operate under low pressure. This low pressure allows for the successful injection of steam, which transfers heat to the oil, reducing its viscosity such that the oil will flow to the producing well. The low pressure also allows for more favorable flowing conditions for the oil versus water (water exists in the oil reservoir in approximately equal parts). This phenomenon is called "relative permeability." When backpressure against a producing well increases, water will flow to the well bore more readily than oil because water is a very small molecule and moves faster and in greater volume than oil. Thus, the total volume of fluid moving toward the well bore stays constant, but the water moves more easily than the oil, so the production of oil actually goes down. Under high backpressure, the flow of oil would actually cease.

28. This backpressure effect hindered KRH's oil production beginning in April 2018 and was caused by increased air temperature during the summer, which hindered KRH's ability to cool down the gas exiting the well bore, thereby increasing the back pressure and the lingering effects of a temporary shut-in of KRH's fields in 2016.

29. For a nearly a two-month period from May 21, 2016, to July 14, 2016, the San Pablo Bay Pipeline, which KRH utilizes to transfer its oil production to its primary purchaser (at that time, Shell Trading (US) Company ("Shell Oil")), was unexpectedly shut down due to a rupture in the pipeline near Tracy, California. Because it could not transfer oil to Shell Oil (and,

as discussed below, Shell Oil attempted to terminate the supply contract due to an alleged force majeure), KRH was forced to drastically reduce its production from about 2,500 barrels per day to about 1,000 barrels per day.

30.    KRH could not entirely shut in its field, however, as that would have irreparably damaged the field, so it had to continue to add steam and produce suboptimal amounts of oil. Due to this reduced production, KRH needed to inject a large quantity of high temperature, high pressure steam to reheat the field, which caused, in addition to the high air temperatures this past summer, the backpressure to reach as high as 35 pounds with a range of 10-35 pounds for many months. This caused KRH's oil production temporarily to decline.

31.    With the installation of additional cooling equipment, the backpressure has started to recede; however, the process will likely take several months before the oil re-saturates at the wellbore. We believe it will take between six and twelve months for the reservoir to rebalance back to the 2,500-3,000 barrels per day level of oil production. This is consistent with the position of Netherland, Sewell & Associates ("NSAI"), the worldwide leader in petroleum property valuations, as estimated production in its latest June 30, 2018 Reserve Report.

32.    Second, KRH started up steamflood operations in a second oil interval that is deeper but still within the existing well bores. During startup operations (drilling of some new wells and steaming the new sand in the producing wells), the previously existing production was temporarily shut-in leading to lower overall production during the last two months.

33.    Finally, KRH reallocated the distribution of steam within the sands being steam flooded. This was done to gain an increase in production from specific sands that were not producing at their optimum levels. In any steam flood, it takes time (12-18 months) for the steam to heat up the reservoir and for oil production to increase.

34.     For all the reasons stated above, the reduction of oil production is temporary and KRH anticipates returning to its historical production volumes of 2,500-3,000 barrels per day in approximately 6 to 8 months.

## 2.     WPS Assets and Operations

35.     WPS owns and operates a 20-megawatt cogeneration facility located adjacent to KRH in the Kern River Oil Field. The facility consists of a GE LM2500 gas turbine de-rated to 20 MW driving a 25,000 KVA Brush generator and a Deltak heat recovery steam generator rated at 70,000 lbs/hr. WPS sells approximately 80 percent of the electricity it produces to PG&E and sells the remaining amount directly to KRH for use in its operations. WPS also provides up to 55,000 pounds per hour (3,750 bpd) of superheated steam to KRH for use in KRH's steam flooding process.

## 3.     AAOG Assets and Operations

36.     AAOG provides certain administrative and accounting services to KRH and WPS from its offices in San Antonio. In exchange for these services, it receives a management fee of $108,000 and $27,000 per month, respectively, from KRH and WPS. Additionally, AAOG collects a 0.94% mineral interest from KRH.

## B.     The Company's Corporate Organizational Structure

37.     AAOG is a Delaware corporation that was founded and incorporated in 2003, and has its principal place of business in San Antonio, Texas. KRH and WPS are both direct, wholly-owned subsidiaries of AAOG. KRH was originally incorporated in Colorado but was reincorporated in Delaware as part of the 2016 AB/GS Restructuring (defined below). WPS is incorporated in Delaware. Both KRH and WPS principally operate in Bakersfield, California. The following is a corporate organizational chart depicting the ownership structure of the Company:



38.     My father, Robert Morris, AAOG's current CEO and largest shareholder, and a new management team took control of the Company around January 2014. In August and September 2013, after becoming dissatisfied with the way prior management (including my uncle) was running AAOG, stockholders holding a majority of outstanding shares of AAOG's common stock signed written consents resolving to remove the then-existing AAOG Board and to appoint and elect a new Board led by my father, (who at that time was AAOG's single largest shareholder, albeit a minority shareholder), and four other directors. While the old board and management initially contested their removal, the parties quickly resolved their disputes. As part of that resolution, AAOG's incumbent Board resigned, and my father purchased all the shares of AAOG common stock beneficially owned by my uncle, AAOG's resigning Chairman, CEO and second-largest shareholder, for a purchase price of $4,579,540 (at a per share price of almost $13), purchasing these shares for his own account and as agent of AAOG. My father acquired about one-third of these shares for himself and transferred for no value the remaining shares purchased in the settlement back to the AAOG treasury, constituting almost 10% of the total number of shares held by stockholders at that time.

## C.     The Company's Historical Financing Efforts

39.     Unlike many E&P companies, the Company was able to weather the mid-decade downturn in oil prices without defaulting on any of its debt obligations. To do so, however, the Company was forced on multiple occasions to borrow additional funds—at unfavorable interest

rates—to cover its lenders' discretionary borrowing base redeterminations. While the Company has been able to service this additional debt, even with higher oil prices, it has not been able meaningfully to reduce the principal. A history of the Company's historical financing efforts is discussed below.

### 1.    The Chambers Credit Facility

40.    In January 2014, KRH was party to a $57 million secured credit facility with Chambers Energy Capital LP ("Chambers", and when referring to the credit facility, the "Chambers Credit Facility"). In February 2014, AAOG engaged investment banker Niagara Capital Limited ("Niagara") and Cappello Global LLC ("Cappello") in order to assist it in refinancing the Chambers Credit Facility, which was due to expire at the end of 2014, and assist KRH in borrowing an additional $5-10 million for additional capital expenditures. In March 2014, the Company increased KRH's principal indebtedness to Chambers under the Chambers Credit Facility to $107 million (the "Chambers Refinancing").

### 2.    The GE/Fortress Refinancing

41.    During the first week of October 2014, KRH closed on a refinancing transaction with GE and Fortress (the "GE/Fortress Refinancing") that resulted in the Chambers Credit Facility being paid off in full and KRH being indebted to GE and Fortress in the amount of $131 million (the "GE/Fortress Credit Facility"). Approximately $7.7 million of that amount was used for additional KRH capital expenditures to increase oil production.

### 3.    The Second Lien Financing Transaction

42.    Just as the October 2014 refinancing transaction was closing, however, oil prices began to plummet and enter an extended bear market. Between the first full week of October 2014 and May 2015, the price of a barrel of West Texas Intermediate ("WTI") crude oil fell from the $85-90 per barrel range to the $58-60 dollar per barrel range. Consequently, on May 19,

2015, GE and Fortress exercised their rights under the GE/Fortress Credit Facility to make a borrowing base redetermination and demanded a repayment of $20 million in principal. In order to fund this shortfall, and make an additional principal paydown, KRH entered into a second-lien credit facility with AB Private Credit Investors Middle Market Direct Lending Fund, L.P ("AB") for $50 million (the "Second Lien Financing Transaction"). Of this amount, $45 million was used to pay down the GE/Fortress Credit Facility, and $5 million was used to pay for the closing costs of the Second Lien Financing Transaction. The Second Lien Financing Transaction closed in late August 2015, when WTI was in the $46-$49 per barrel range. Shortly thereafter, AB syndicated 40% of the Second Lien Facility to Goldman Sachs Specialty Lending Holdings, Inc. ("GS").

### 4. The 2016 AB/GS Restructuring

43. On May 4, 2016, GE and Fortress made another borrowing base redetermination seeking another repayment of principal, this time of $15 million. Shortly thereafter, the San Pablo Bay Pipeline, through which KRH transported its oil to an oil refinery of Shell Oil near San Francisco, ruptured, shutting in KRH's oil production until the pipeline came back on line in mid-July 2016.

44. On August 22, 2016, AB and GS agreed to exercise their right under the 2015 Intercreditor Agreement (defined below) with GE and Fortress to refinance the GE/Fortress Credit Facility (the "2016 AB/GS Restructuring"), which closed on September 30, 2016 and resulted in AB and GS holding $51.1 million of KRH's second-lien debt and $87.6 million of KRH's first-lien debt. The 2016 AB/GS Restructuring also resulted in the elimination of future borrowing base redeterminations (so long as KRH was in compliance with its loan covenants), new amortization payments on both the first and second lien credit facilities, new loan covenants

and interest rates on both credit facilities, and penny warrants being issued to AB and GS to purchase AAOG stock.

## II.     The Company's Current Financial Condition

### A.     Summary of Assets and Recent Financial Performance

45.     As of October 31, 2018, the Debtors have total assets on a consolidated basis with a book value of approximately $75 million, consisting of facilities and support equipment, oil properties (at full cost method), cash and cash equivalents, inventory, receivables, fair value of oil and gas derivative contracts and other general intangibles.  In addition, the Debtors on a consolidated basis have approximately $80.2 million in net operating losses as of September 30, 2018.

46.     KRH is cash flow positive—with approximately $25 million in EBITDA in 2017—and is current on all obligations to unsecured creditors. AAOG and WPS are similarly cash flow positive and current on their unsecured debt. The Company believes that it has sufficient cash flow from operations to fund its obligations during these Chapter 11 Cases without debtor-in-possession financing.

### B.     Prepetition Funded Indebtedness

#### 1.     Overview

47.     As of the Petition Date, the Company has $141,942,197 in total funded debt obligations. KRH is the borrower (the "Borrower") under both the First Lien Facility and the Second Lien Facility described in greater detail below.  AAOG and WPS are guarantors and pledgors of both Credit Facilities.  These Credit Facilities are secured by collateral consisting of all of the assets of AAOG, KRH and WPS.

48.     As discussed above, from September 30, 2016, until October 17, 2018, the administrative agent for both Credit Facilities was AB-Private Creditor Investors LLC (the "AB

Administrative Agent"), and the lenders were AB[15] and GS. Late in the afternoon of October 17, 2018, AB and GS closed on the sale of their debt to KCO7, and KCO7 replaced the AB Administrative Agent as the new administrative agent under both of the Credit Facilities.

## 2. First Lien Facility

49. On September 30, 2016, KRH entered into (i) that certain Amended and Restated Credit Agreement, dated as of September 30, 2016, in the principal amount of $87.6 million, by and among KRH, as Borrower; AAOG and WPS, as guarantors (the "Guarantors"), pursuant to that certain Amended and Restated Guaranty, dated as of September 30, 2016, in favor of the First Lien Agent (as defined below) (the "First Lien Guaranty"); the Lenders party thereto from time to time (the "First Lien Lenders"); and the AB Administrative Agent, as Administrative Agent (in such capacity, the "First Lien Administrative Agent") (as amended, modified or supplemented and in effect from time to time, the "First Lien Credit Agreement"), and (ii) all of the security, pledge, control, and collateral agreements and documents executed in connection with the First Lien Credit Agreement (the "First Lien Security Documents," and together with the First Lien Credit Agreement, First Lien Guaranty, the First Lien Hedging Contracts and the First Lien Treasury Management Agreements, "First Lien Loan Documents") in favor of the AB Administrative Agent, as Collateral Agent (in such capacity, the "First Lien Collateral Agent," and together with the First Lien Administrative Agent, the "First Lien Agent," and together with the First Lien Lenders, First Lien Hedging Counterparties (defined below), and First Lien Treasury Counterparties (as defined in the First Lien Credit Agreement), the "First Lien Secured Parties").

---

[15] AB was identified as one of the two lenders in the two 2016 credit facility documents. Since then, it appears that AB assigned its share of these loans to six other affiliated AB funds. For the purposes of this First Day Declaration, the entities holding this portion of the debt will be collectively referred to as "AB."

50. On or around October 15, 2018, AB and GS executed that certain Loan Assignment and Assumption Agreement (the "Loan Assignment Agreement"), thereby assigning their interest in the First Lien Loan Documents to KCO7. The Company understands that this transaction was funded—and closed—on the afternoon of October 17, 2018. KCO7 then became the First Lien Agent under the First Lien Credit Agreement and First Lien Security Documents, respectively. KCO7 provided us with a heavily redacted copy of Loan Assignment Agreement pursuant to which KCO7 purchased KRH's debt from AB and GS but has refused our repeated requests to provide us with an unredacted copy of this agreement.

51. As mentioned above, the First Lien Credit Agreement does not include a borrowing base deficiency clause.

### 3. Second Lien Facility

52. On August 31, 2015, KRH entered into (i) that certain Second Lien Credit Agreement, dated as of August 31, 2015, by and among KRH, as Borrower; AAOG and WPS, as Guarantors, pursuant to that certain Guaranty dated as of August 31, 2015, in favor of the Second Lien Agent (as defined below), as supplemented by the Guaranty Supplement dated as of September 30, 2016 (collectively, the "Second Lien Guaranty"); the Lenders party thereto from time to time (the "Second Lien Lenders"); and the AB Administrative Agent, as Administrative Agent (in such capacity, the "Second Lien Administrative Agent") (as amended, modified or supplemented and in effect from time to time, the "Second Lien Credit Agreement" and together with the First Lien Credit Agreement, the "Credit Agreements"), and (ii) all of the security, pledge, control, and collateral agreements and documents executed in connection with the Second Lien Credit Agreement (collectively, the "Second Lien Security Documents"; together with Second Lien Credit Agreement and Second Lien Guaranty, the "Second Lien Loan Documents"; and collectively with the First Lien Loan Documents, the "Pre-Petition Loan

Documents") in favor of AB Administrative Agent, as Collateral Agent (in such capacity, the "Second Lien Collateral Agent"; together with the Second Lien Administrative Agent, the "Second Lien Agent"; and collectively with the First Lien Agent, the "Pre-Petition Agents"; the Second Lien Agent and Second Lien Lenders, collectively, the "Second Lien Secured Parties").

53.     On or around October 15, 2018, AB and GS executed the Loan Assignment Agreement, thereby assigning their interest in the Second Lien Loan Documents to KCO7. The Company understands that this transaction was funded—and closed—on the afternoon of October 17, 2018. KCO7 then became the Second Lien Agent under the Second Lien Credit Agreement and Second Lien Security Documents, respectively.

54.     The First Lien Collateral Agent, Second Lien Collateral Agent, and KRH entered into the Intercreditor Agreement, dated as of August 31, 2015 (the "2015 Intercreditor Agreement"). The 2015 Intercreditor Agreement governs the respective rights and priorities of the First Lien Secured Parties and Second Lien Secured Parties.

### C.     Hedging Arrangements

55.     KRH and Shell are parties to that certain ISDA Master Agreement, dated October 1, 2014 (the "Shell Hedging Agreement"), pursuant to which the parties have entered into multiple written confirmations of derivative transactions in order for KRH to hedge its exposure to fluctuations in oil prices. KRH's obligations under the Shell Hedging Agreement are secured by KRH's assets and rank *pari passu* with the liens of the First Lien Collateral Agent. As of the Petition Date, KRH owed Shell under the Shell Oil Hedging Agreement approximately $3.0 million. On October 31, 2014, KRH and Shell also executed a swap transaction confirmation pursuant to the Shell Hedging Agreement in order for KRH to hedge its exposure to natural gas.

56.     KRH and BP are parties to that certain ISDA Master Agreement, dated June 15, 2012 (the "BP Hedging Agreement"), pursuant to which the parties have entered into multiple

written confirmations of derivative transactions in order for KRH to hedge its exposure to fluctuations in oil prices. KRH's obligations under the BP Hedging Agreement are secured by KRH's assets and rank *pari passu* with the liens of the First Lien Collateral Agent. As of the Petition Date, BP owes KRH under the BP Hedging Agreement approximately $3.3 million.

57.     BP and Shell are collectively referred to as the "First Lien Hedging Counterparties."

58.     Additionally, BP, Shell and KRH, as Swap Counterparties, KRH, as Borrower, and the First Lien Agent entered into the Intercreditor Agreement, dated as of October 6, 2014 (the "2014 Intercreditor Agreement", and together with the 2015 Intercreditor Agreement, the "Intercreditor Agreements"). The 2014 Intercreditor Agreement governs the respective rights and priorities of the First Lien Secured Parties and First Lien Hedging Counterparties.

59.     Finally, KRH entered into an ISDA Master Agreement dated September 30, 2016 with J. Aron & Company ("J. Aron") pursuant to which it entered into an interest rate swap to hedge its exposure to interest rate fluctuations.

### D.     Common Stock and Warrants

60.     AAOG currently has one series of 6,100,346 shares of common stock issued and outstanding. AAOG directly owns 100% of the equity of KRH and WPS. Two employees of KRH collectively own 180,000 restricted stock units that are convertible into 180,000 shares of AAOG common stock.

61.     In addition, as part of the Second Lien Credit Facility, AAOG issued AB warrants (as amended, the "AB Warrants") entitling it to purchase from AAOG up to 1,257,461 shares of common stock of AAOG (subject to adjustment as provided for in the AB Warrants) at the exercise price of $0.01 per share, all on the terms and conditions and pursuant to the provisions set forth in the AB Warrants. In addition, as part of the Second Lien Credit Facility, AAOG

issued GS warrants (as amended, the "GS Warrants", and with the AB Warrants, the "Warrants") entitling them to purchase from AAOG up to 835,988 shares of common stock of AAOG (subject to adjustment as provided for in the GS Warrants) at the exercise price of $0.01 per share, all on the terms and conditions and pursuant to the provisions set forth in the GS Warrants.

62.     On or around October 15, 2018, AB and GS allegedly assigned their interest in the Warrants to KCO7 by the Loan Assignment Agreement.

### E.     Mineral Interests

63.     The Company pays ordinary course royalty payments to mineral interest owners based on a percentage of oil production. The Company estimates that, as of the Petition Date, there is approximately $800,000[16] outstanding on account of Royalty Interests and $530 of Shut-In Payments owed to holders of Leases, with the entirety of that amount due November 25, 2018.

64.     In addition to ordinary course royalty payments, KRH also pays an overriding royalty interest ("ORRI") on all production from the Nukern property to the former owner of the Nukern property, Kern USA, Inc. ("KUI"), of $1 per barrel gross production for each barrel produced from 2 million barrels to 4 million barrels. The 2 million barrel mark was reached in July 2016 and, to date, approximately 3.11 million barrels has been produced from the Nukern property, resulting in royalty payments paid to KUI in the amount of $1.1 million. The Nukern property currently has an additional 886,000 barrels remaining before it reaches 4 million barrels and KUI's royalty interest is fully paid. KRH anticipates hitting the 4-million barrel mark in February 2020.

---

[16]    This amount is in addition to approximately $373,636 in "suspended funds" that are Royalties due and owing to certain holders of Royalty Interests but are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest. Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the suspended funds to particular holders of Royalty Interests is resolved, the Debtors will release the suspended funds in question.

**F.      Unsecured Debt**

65.      KRH owes approximately $1,013,570 to AAOG's Chief Executive Officer Robert Morris on account of that certain unsecured note dated September 30, 2016, which bears interest at 5% per annum (the "Morris Note"). The Morris Note is due the later of (i) 95 days after the Credit Facilities are paid in full and (ii) January 1, 2021.

66.      Additionally, as of the Petition Date, the Debtors owe certain trade vendors in the approximate aggregate amount of $6.5 million, none of which was past due as of the Petition Date.

**G.      Intercompany Transactions**

67.      As mentioned above, AAOG provides certain administrative and accounting services to KRH and WPS from its offices in San Antonio. In exchange for these services, it receives a management fee of $108,000 and $27,000 per month, respectively. Additionally, AAOG collects a 0.94% mineral interest from KRH.

68.      From time to time, KRH will make intercompany loans to WPS to fund equipment purchases and upgrades. WPS is the Borrower under that certain Subordinated Promissory Note, dated as of June 19, 2018, by and between WPS and KRH, as Lender (the "WPS Promissory Note"). Pursuant to (i) the Third Amendment to the First Lien Credit Agreement, and (ii) the Eighth Amendment to the Second Lien Credit Agreement, WPS is authorized to use the proceeds of the WPS Promissory Note to fund the purchase and installation of a stator ("Stator"), the stationary part of its generator, under an executory contract with Brush GMS (the "Brush Agreement"). Because delivery and installation of the stator is necessary for the continued operation of WPS's business, the Debtors will seek, by separate motion, to assume the Brush Agreement and continue to perform according to its terms.

69.     KRH has also provided loans to AAOG in the amount of $500,000 and $1.25 million on an unsecured basis and such loan balances are recorded book entries on each of the Company's respective financials.

## H.     Pending Litigation

70.     The Company is currently involved in two litigation matters. The first is a lawsuit initiated by KRH against Shell Oil in December 2017. Therein, KRH asserts that Shell Oil breached the parties' supply agreement by refusing to accept delivery of, and to pay for, crude oil for a period of nearly two months on account of a claimed force majeure. KRH alleges that it was damaged in an amount no less than $3,306,348, as well as pre-judgment and post-judgment interest at the maximum legal rate, attorneys' fees, all other costs of court, and all other relief to which KRH may be justly entitled. The lawsuit remains pending in Harris County, Texas, and KRH anticipates proceeding with the lawsuit during these Chapter 11 Cases.

71.     The second lawsuit, filed against AAOG and KRH on November 8, 2018 in Los Angeles County Superior Court is a professional fee dispute regarding the rights of KRH's former investment banker, Niagara (which assigned its claims to the plaintiff, Camden Financial Services ("Camden")), to receive a transaction fee on account of the 2016 AB/GS Restructuring, wherein then-second-lien-lenders AB and GS exercised their right to buy out the First Lien Credit Facility.[17] Camden alleges that Niagara, which KRH had engaged for the Chambers Refinancing, GE/Fortress Refinancing and the Second Lien Financing Transaction, was entitled to a banking fee for the 2016 AB/GS Restructuring in the amount of $4.162 million (on top of the more than $7 million that Niagara had already earned). AAOG and KRH dispute these allegations.

---

[17] Niagara, as opposed to Cappello, owns the broker dealer license required to collect the disputed fee. Niagara assigned its claim to Camden, the named plaintiff in this litigation.

## III.    Events Leading Up to the Chapter 11 Filing

72.    Unlike many E&P cases, this bankruptcy filing is not the result of the Company's poor operational underperformance, illiquidity, debt maturities or lack of underlying value. Rather, it was precipitated by KCO7's efforts to exploit its rights under the Credit Agreements to obtain the Debtors' assets "on the cheap," and thereby to destroy tens of millions in equity value.

73.    A more detailed history of the events leading to the Company's bankruptcy, including the actions of KCO7, are described below.

### A.    The Company Is Approached by Grade 6

74.    In August 2018, I learned from AB that Grade 6, led by Cary Meadow (one of the Company's former investment bankers), was interested in purchasing the debt under the Facilities. During the course of Grade 6's extensive due diligence of the Company, it repeatedly shared with me and other members of management that its acquisition of the Company's debt was intended solely as a stepping stone towards eventually acquiring AAOG's assets.

75.    From the outset, Grade 6 has repeatedly made clear to me and my colleagues that it had no interest in being a lender. Indeed, as discussed above, Grade 6 and KCO7 are both led by Mr. Meadow and Mr. Kromwyk, two investment bankers who were fired for cause from AAOG and KRH's former long-time investment banker and financial advisor, Cappello.[18] While at Cappello, and under an NDA with AAOG, Mr. Kromwyk was substantially involved in the representation of AAOG and intimately involved in their prior refinance efforts. He had complete access to all of the Company's confidential information, reserve reports, business plans

---

[18] *See* Statement of Claim in *Cappello Capital Corp. v. Meadow*, (FINRA April 17, 2015), attached hereto as **Exhibit B** against Cary Meadow and Paul Kromwyk for breach of fiduciary duty, misappropriation of confidential information, and fraud among other allegations. In addition to the specific allegations concerning the above actions, none of which mention AAOG, Capello asserts that Messrs. Meadow and Kromwyk have "repeatedly and systematically, without permission, taken copied or made us of Claimants data" relating to Cappello's engaged and prospective clients (Par. 71). We do not at this time know if the specific data relating to our Company was taken, or just accessed when Mr. Kromwyk was working on our matters.

and had regular and substantive involvement. Based on this confidential, inside information, Messrs. Kromwyk and Meadow, having left Cappello, have implemented a predatory loan-to-own strategy attempt to strip the Company of their substantial equity value.

76.     On or about September 25, 2018, Mr. Meadow informed me that Grade 6 had reached an agreement in principle to acquire the Company's debt from AB and GS at a purportedly steep discount.  Company representatives, including myself, met with Grade 6 shortly thereafter to discuss next steps assuming the debt purchase went forward.  At this initial meeting, Grade 6 proposed an unworkable transaction that would have preferred AAOG's insiders and left its other approximately 125 shareholders with a shared $2 million recovery. AAOG's Board unanimously rejected this proposal during a telephonic Board meeting in which I participated, and the Company explained to Grade 6 that based on a 2016 valuation of its equity—performed at a time when oil prices were significantly depressed—the Company believed there was, in fact, substantial equity value.  AAOG also made clear, however, that it was willing to negotiate a fair purchase price benefitting all shareholders, and to submit any agreement to a shareholder vote.

**B.     Meeting With Grade 6 In New York**

77.     Expressing a willingness to negotiate further, Mr. Meadow requested a meeting with AAOG's CEO, Robert Morris, prior to its closing on the purchase of the Company's secured debt. Robert Morris agreed and met with Mr. Meadow in New York City on October 17, 2018.  I also attended this meeting, along with AAOG's general counsel, David Katz, and Hershal Ferguson, Jr., a member of AAOG's Board.  But instead of engaging in the promised good faith negotiation—and before, in fact, its purchase of the Company's debt had even formally closed—Mr. Meadow handed us a default notice (the "Default Notice") for allegedly being insufficiently hedged, in purported violation of Section 6.22 in the First Lien Credit

Agreement and Section 6.23 in the Second Lien Credit Agreement. We viewed the Default Notice—provided during a meeting to discuss the price and terms of a potential acquisition—as an attempt to intimidate us into handing over the Company for little or no value to its shareholders. The Default Notice also stated that KCO7 had elected to begin charging the default rate of interest on all KRH's debt.

78.     The Default Notice was the first time in roughly two months of interacting with Grade 6 that it ever expressed its belief that KRH was in default under the Credit Agreements, or that the sufficiency of KRH's hedges was even discussed. Additionally, at the meeting on October 17, Mr. Meadow refused to answer my question as to what specific actions he believed KRH needed to take with respect to its obligation to enter into oil hedging contracts.

### C.     The Alleged Default And The Company's Attempts to Cure

79.     I am informed that the Credit Agreements require KRH, under certain circumstances, to hedge a certain percentage of its production for a rolling forward, two-year period. KCO7 asserts that the Company failed to sufficiently hedge its production beginning in April 2018. This position is in stark contrast to that of the Company's prior lender, AB. I understand from my communications with AB that AB was aware that KRH had not placed any new hedges after it was arguably required to do so in April 2018, and had deferred to KRH's expertise in determining when the best time was to enter into new oil hedging contracts. AB never required KRH to enter into oil hedging contracts by a date certain, and never declared—or threatened to declare—an event of default (the "Event of Default") relating to KRH's decision not to enter into new oil hedging contracts immediately after it might have been required to do so under the loan documents. Indeed, it had never noticed an Event of Default for insufficient hedging at all or rejected KRH's 2018 Q1 and Q2 compliance certificates certifying that no events of default existed during those quarters. Instead, AB had historically permitted KRH to

wait until near the end of the calendar year to place its hedges. Before KCO7 purchased its debt, KRH had intended to follow this past practice, and to place hedges throughout the fourth quarter of this year. In this way, all hedges required under the Credit Agreements would be in place by year end.

80.     The Company was thus taken a back when KCO7 declared an immediate Event of Default under the Credit Agreements, viewing KCO7's actions as a pretextual "stepping stone" to KCO7's intended acquisition of the Company. In fact, based on the language of the Default Notice, at first the Company did not even understand the nature of the default KCO7 was claiming. Nonetheless, the Company attempted to understand KCO7's position and, thereafter, to comply with KCO7's demands to put hedges in place.

81.     The Company, however, faced some unanticipated complications—most of which were caused by KCO7—in attempting to put these hedges in place. First and foremost, KCO7 had declared an Event of Default that, if not rescinded, would make it impossible for the Company to put hedges in place. In light of KCO7's representation, the Company approached its two existing counterparties—BP and Shell—to obtain the price and terms of new hedges. Upon doing so, the Company learned that KCO7 had failed to provide BP and Shell with the requisite 30-day notice of change in collateral agent, as it was required to do under the applicable 2014 Intercreditor Agreement, and that neither would enter into hedges with the Company until KCO7 had satisfied these requirements. In other words, KCO7's failure to comply with the 2014 Intercreditor Agreement precluded the Company from taking the actions necessary to cure the alleged Event of Default. Moreover, the Company learned that, because it is in active litigation with Shell Oil, Shell Oil's counsel must approve any transactions with the Company, which will further delay the Company's efforts to place hedges. Throughout this process, the Company kept

KCO7 updated on its efforts, and the difficulties it was encountering, and repeatedly requested that the notices of default be rescinded, and that the parties agree on a consensual hedging program.

### D. The Company Assesses Current Value

82. In the midst of the hedging disputes, understanding that a current and accurate understanding of value was critical to protecting the interests of its stakeholders, the Company engaged Houlihan to, among other things, conduct a valuation of its assets. The Company requested that KCO7 pay for the valuation, but it refused. After conducting a thorough valuation of the Company and its assets, Houlihan concluded that the Company's enterprise value is between $175 million and $195 million. Taking into account the Company's existing secured and unsecured debt, the Company's equity value should be valued at between $35 million and $55 million.

### E. The November 7, 2018 Meeting

83. On November 1, 2018, KCO7 invited the Company to a meeting to discuss the parties' disputes under the Credit Agreements and to explore the terms of a consensual acquisition transaction. This meeting, attended by principals and their counsel, took place in New York on November 7, 2018.

84. Ultimately, the November 7 discussions ended without—in the Company's view—any realistic prospect of an agreed transaction, as KCO7 and the Company continue to hold highly divergent views as to the equity value of the Company.

### F. The Company's Bankruptcy Filing

85. KRH was scheduled to make an interest payment to KCO7 under the Second Lien Credit Agreement on November 8, 2018. On November 5, 2018, KCO7 provided an interest notice to KRH requesting an interest payment at a default rate of 3% above the base rate in the

Second Lien Credit Agreement in a total cash amount of $1,492,853.45 and a payment-in-kind interest of $1,274,340.84. Given the current circumstances—including the disputed Event of Default for the alleged covenant breach, the now-accruing default interest, the vast difference of views between the parties regarding the Company's equity value, and the unlikelihood that the Company could successfully refinance KCO7's debt under this confluence of circumstances— KRH determined that making the interest payment under the present circumstances, and continuing to engage with KCO7 without bankruptcy court protection, jeopardized both the Company's short term ability to meet its going concern obligations and its long term ability to maximize the value of their businesses for their stakeholders. The Company thus decided not to make the scheduled interest payment, and to instead file these cases to protect the interests of unsecured creditors, the equity value of their shareholders and to restructure or refinance their secured debt.

## IV. The Cash Collateral Motion

86. By the Cash Collateral Motion, the Debtors seek relief in two stages: <u>first</u>, entry of an Interim Order authorizing the Debtors' use of Cash Collateral, and granting adequate protection to the Debtors' pre-petition secured lenders, on an interim basis; and <u>second</u>, entry of a Final Order authorizing the Debtors' use of Cash Collateral, and granting adequate protection to the Debtors' pre-petition secured lenders, on a final basis.

87. The relief sought in the Cash Collateral Motion is the product of the Debtors' sound business judgment and is appropriate and necessary to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors. The requested relief represents a fair and reasonable compromise between the competing interests of the Debtors' secured lenders, the Debtors' unsecured creditors and the Debtors' equityholders. Entry of the Interim Order, followed by entry of the Final Order, is critical to the Debtors' ability successfully to pursue their reorganization and maximize value for all stakeholders. Furthermore, the relief requested in the Cash Collateral Motion will benefit all parties in interest, as such relief will ensure the Debtors have sufficient liquidity to give parties in interest the time necessary to protect and assert their respective interests during these Chapter 11 Cases. In short, the relief requested in the Cash Collateral Motion is the product of the Debtors' sound business judgment, appropriately balances the many competing interests in these Chapter 11 Cases, and is a necessary predicate for the Debtors to successfully restructure and maximize their value for the benefit of all stakeholders.

88. Absent the Court's authority to use Cash Collateral during these Chapter 11 Cases, the Debtors will be unable to fund the necessary operating expenses of their businesses, and will be required to shut down their operations. Shutting down operations would result in serious, immediate and irreparable harm to the Debtors, their estates, and *all* of their stakeholders, including secured debtholders and equityholders alike. An immediate and critical

need thus exists for the Debtors to use the Cash Collateral, in accordance with the Initial Budget (as defined below) and each subsequently approved budget.

### A. Proposed Use of Cash Collateral

89. The Debtors' business model is predicated upon their ability to exploit their oil assets, bring the production to market, and utilize the proceeds in their business operations. To execute on this business model, the Debtors must have access to sufficient cash to fund working capital, capital expenditures, research and development efforts and for other general corporate purposes, including satisfying payroll, paying suppliers, meeting overhead, and making any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses.

90. I am familiar with the Initial Budget and its contents, which the Debtors have formulated with the assistance of their advisors. The Initial Budget is intended to provide the Debtors with sufficient funding during the Interim Period to meet the objectives described herein and in the Cash Collateral Motion. I believe that the Initial Budget is fair, reasonable and appropriate under the circumstances. I also believe that the Initial Budget will be adequate to pay administrative expenses set forth in the Initial Budget during the Interim Period.

### B. Adequate Protection

91. Based on information provided to me by counsel and the Debtors' other advisors, I believe that the adequate protection proposed in the Cash Collateral Motion to be provided to the First Lien Secured Parties and Second Lien Secured Parties with respect to Cash Collateral used during the Interim Period is appropriate under the circumstances, satisfies the requirements under the Bankruptcy Code, and is consistent with relief granted by courts in this jurisdiction and others. As set forth more fully in the Cash Collateral Motion, the Debtors will provide adequate protection for the use of Cash Collateral during the Interim Period, subject to the Carve-Out,

solely to the extent of any diminution in the value of the First Lien Secured Parties' and Second Lien Secured Parties' interests in the Pre-Petition Collateral, including, without limitation, Cash Collateral, from the Petition Date, resulting from (a) the use of Cash Collateral and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. Furthermore, adequate protection is provided only to the extent of the priority, enforceability, unavoidability and validity applicable to the First Lien Secured Parties' security interests and liens in the Pre-Petition Collateral and the Second Lien Secured Parties' security interests and liens in the Pre-Petition Collateral as of the Petition Date.

92.     The adequate protection consists of granting Replacement Liens and Superpriority Claims to the First Lien Secured Parties and Second Lien Secured Parties. In addition, I believe the First Lien Secured Parties and Second Lien Secured Parties are adequately protected as a result of the Debtors' continued operation of their businesses in the ordinary course and the exploitation of the oil assets securing the First Lien Obligations and Second Lien Obligations. By continuing to operate in the ordinary course, the Debtors will preserve the value of the Debtors' assets, generate additional Cash Collateral, and avoid potential acceleration of costs related to plugging and abandoning over 100 wells, which would have a devastating effect on the value of the Debtors' assets and viability as a going concern. The costs and damage that would occur from shutting down operations exceed any "losses" the First Lien Secured Parties and Second Lien Secured Parties would incur from the sale of the Debtors' oil during the course of their Chapter 11 Cases, particularly because the Debtors do not expect the Chapter 11 Cases to remain open for a long period of time, and the sale of oil generates additional Cash Collateral.

### C.     Interim Relief is Necessary to Avoid Immediate and Irreparable Harm

93.     The Debtors require immediate access to Cash Collateral during the Interim Period to fund the operation of their businesses in order to avoid immediate and irreparable harm

to their estates, and to grant adequate protection in connection therewith. Any delay in granting the emergency relief requested in the Cash Collateral Motion would severely disrupt the Debtors' operations at this critical juncture and cause irreparable harm.

94. To protect the First Lien Secured Parties and Second Lien Secured Parties, the Debtors' use of Cash Collateral during the Interim Period will be strictly limited to the amounts set forth in the Initial Budget, subject to Permitted Deviations, thereby providing additional safeguards for all creditors of the Debtors' estates. And if the Debtors are not granted access to Cash Collateral during the Interim Period, the Debtors' would be forced to cease operation of their businesses, leading to a value-destroying result for all of the Debtors' stakeholders, including the First Lien Secured Parties and Second Lien Secured Parties. Accordingly, I believe that the Debtors have satisfied the "immediate and irreparable harm" standard under Bankruptcy Rules 4001(b)(2) and 6003.

## V. Other First Day Motions[19]

95. Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet. I have reviewed each of the First Day Motions. I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Motions is detailed below.

---

[19] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

## Administrative and Procedural Motions

**A.**   **Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion").**

96.   Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. I believe that parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases. Accordingly, I believe that the joint administration of these Chapter 11 Cases is in the best interests of their estates, their creditors, and all other parties in interest.

**B.**   **Debtors' Emergency Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs ("SOFA Extension Motion").**

97.   Pursuant to the SOFA Extension Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 23 days, for a total of 37 days from the Petition Date, through and including December 19, 2018, without prejudice to the Debtors' ability to request additional extensions for cause shown.

98. To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, and contracts from each Debtor entity. Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees. Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements. This is a significant amount of work considering the expedited nature of the Debtors' bankruptcy filing and the relatively small accounting staff to assist in the preparation of the Schedules and Statements.

99. In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for these Chapter 11 Cases. I believe that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

**C. Debtors' Emergency Application for Order Appointing BMC Group, Inc. as Claims, Noticing, Solicitation, and Administrative Agent ("Claims Agent Application").**

100. Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing BMC Group, Inc. as the Claims and Noticing Agent for the Debtors in their Chapter 11 Cases to (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, and solicitation- and balloting- related services, and (c) assist the Debtors in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases, in each case, pursuant to the terms of the Engagement Agreement.

101.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be hundreds of persons and entities to be noticed and that many of these parties will file claims. In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

### Operational Motions

**A.**    **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief ("Cash Management Motion").**

102.    In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors maintain daily oversight over the Cash Management System and implement cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below). The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

103.    AAOG, KRH and WPS each maintain deposit accounts (the "AAOG Operating Account," the "KRH Operating Account," and the "WPS Operating Account," respectively; collectively, the "Operating Accounts") at Wells Fargo Bank, N.A. ("Wells Fargo") that serve as

the Operating Accounts and fund the petty cash accounts in the Cash Management System. The Operating Accounts collect revenue generated by, and make payments associated with, each Debtor's operating activities including wire and automated-clearing-house ("ACH") transfers. In addition to the Operating Accounts, the Debtors each maintain a petty cash account for employees to use company-issued debit cards for business-related expenses. AAOG and WPS both maintain a petty cash account at Wells Fargo (the "AAOG Petty Cash Account" and the "WPS Petty Cash Account," respectively). KRH maintains a petty cash account (the "KRH Petty Cash Account" and together with the AAOG Petty Cash Account and the WPS Petty Cash Account, the "Petty Cash Accounts") at Union Bank, N.A. ("Union Bank and together with Wells Fargo, the "Cash Management Banks").

104.    In addition, KRH has a certificate of deposit ("CD", and together with the Operating Accounts and the Petty Cash Accounts, the "Bank Accounts") at Union Bank, in the amount of $150,000, and two CDs at Wells Fargo, in the amounts of $150,000 and $100,000, in favor of the State of California to cover environmental and cleanup costs in plugging any abandoned wells. Based upon the number of wells operated by KRH, the Debtors must periodically add additional CDs earmarked for the benefit of the State of California.

105.    The Bank Accounts are summarized in the following table:

| Accounts | Descriptions of Accounts |
| --- | --- |
| **AAOG Operating Account**<br><br>Wells Fargo<br>******2568 | AAOG maintains an Operating Account at Wells Fargo (ending in 2568). This account is for all of AAOG's receipts and disbursements except petty cash transactions. |

| Accounts | Descriptions of Accounts |
|---|---|
| **KRH Operating Account**<br><br>Wells Fargo<br>******2333 | KRH maintains an Operating Account at Wells Fargo (ending in 2333). This account is for all of KRH's receipts and disbursements except petty cash transactions. |
| **WPS Operating Account**<br><br>Wells Fargo<br>******0027 | WPS maintains an Operating Account at Wells Fargo (ending in 0027). This account is for all of WPS's receipts and disbursements except petty cash transactions. |
| **AAOG Petty Cash Account**<br><br>Wells Fargo<br>******9674 | AAOG maintains a Petty Cash Account at Wells Fargo (ending in 9674). It is company policy that the account maintains approximately $15,000. The funds are provided through the AAOG Operating Account at Wells Fargo (ending in 2568). |
| **KRH Petty Cash Account**<br><br>Union Bank<br>******4735 | KRH maintains a Petty Cash Account at Union Bank (ending in 4735). It is company policy that the account maintains approximately $10,000. The funds are provided through the KRH Operating Account at Wells Fargo (ending in 2333). |
| **WPS Petty Cash Account**<br><br>Wells Fargo<br>******4636 | WPS maintains a Petty Cash Account at Wells Fargo (ending in 4636). It is company policy that the account maintains approximately $10,000. The funds are provided through the WPS Operating Account at Wells Fargo (ending in 0027). |
| **Certificates of Deposit**<br><br>Union Bank<br>******1761<br><br>Wells Fargo<br>******6928<br><br>Wells Fargo<br>******7148 | KRH has 3 CDs in favor of the State of California to cover environmental and cleanup costs in plugging any abandoned wells. Based upon the number of wells operated by KRH, the Debtors must periodically add additional CD's earmarked for the benefit of the State of California. |

106. The Debtors each pay, on their own behalf, monthly fees incurred in connection with the Bank Accounts (the "Bank Fees"). The Bank Fees total on average approximately $800

per month and are expensed to KRH. The Union Bank accounts have nominal fees. As of the Petition Date, the Debtors do not believe they have any outstanding amounts owed on account of Bank Fees. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition Bank Fees and to continue paying the Bank Fees, in the ordinary course on a postpetition basis, consistent with historic practice.

**B.**    **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs and (II) Granting Related Relief ("Wages Motion").**

107.    The Debtors' employees and independent contractors are the lynchpin of the Debtors' operations, performing a wide variety of functions critical to the Debtors' operations, the administration of these Chapter 11 Cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In most—if not all—instances, the Debtors' employees and independent contractors include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

108.    The Debtors currently employ 24 individuals on a full-time basis, and one individual on a part-time basis, (the "Employees"). Thirteen of these Employees, including the Debtors' part-time Employee, are paid on an hourly basis. The remaining 11 Employees are salaried.

109.    In addition to their Employees, the Debtors also retain on a regular basis specialized individuals as independent contractors (the "Independent Contractors") to complete discrete projects or tasks. The Debtors currently retain three Independent Contractors, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent

Contractors provide, among other things, geology and geoscience services. The Independent Contractors are a critical supplement to the efforts of the Debtors' Employees.

110.    The vast majority of the Debtors' Employees and Independent Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. These individuals will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation and providing benefits in the ordinary course of business.

### 1.  Compensation and Withholding Obligations

#### a)  Unpaid Wages

111.    The Debtors pay Employees' wages, salaries, and other compensation in arrears on a semimonthly basis (collectively, the "Employee Compensation"), on the 5th and 20th of every month. Because Employees are paid in arrears, Employees will be owed accrued but unpaid wages and/or salary ("Wages") as of the Petition Date. Wages may also be due and owing to Employees as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. The Debtors' consolidated semi-monthly payroll obligations are approximately $128,000.[20]

112.    As of the Petition Date, the Debtors owe approximately $96,109.65 on account of prepetition accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to the 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages") for wages accrued between November 5, 2018 through November 12, 2018. The Unpaid Wages do not exceed, on an individual basis, the statutory cap

---

[20] The exact amount due for payroll period will vary depending on the actual hours worked by the Employees.

in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. To timely issue their next scheduled payroll on November 20, 2018, the Debtors must fund their payroll administrator, Paychex, by no later than November 16, 2018.

113.    The Debtors seek authority to pay any prepetition Unpaid Wages in an amount not to exceed $100,000 on an interim basis, and to continue paying Wages on a postpetition basis in the ordinary course of the Debtors' business.

### b) Discretionary Bonuses

114.    The Debtors have historically provided discretionary bonuses to their employees on an annual basis, in December of each year, equal to approximately $750 per Employee. In order to maintain the stability of their operations during the chapter 11 process, and to promote employee morale and goodwill, the Debtors seek the discretion to continue to make discretionary bonus payments, where appropriate and in the best interests of the estates, up to a cap of $18,000 (collectively, the "Bonus Obligations"). By this Motion, the Debtors do not seek to pay bonuses to any "Insider" as contemplated under section 503(c) (but reserve the right to file a separate motion seeking such relief), nor do the Debtors seek authority to pay of Bonus Obligations in the interim period.

### c) Independent Contractors Compensation

115.    As discussed, the Debtors rely on Independent Contractors in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing drilling, engineering, and other operational services, information technology services, and various other administrative functions. The Debtors rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent

Contractors is critical to minimizing disruption of the Debtors' continued business operations. On average, the Debtors spend approximately $5,000 per month on account of Independent Contractors (the "Unpaid Contractor Obligations"). As of the Petition Date, the Debtors do not believe they have any outstanding amounts owed on account Unpaid Contractor Obligations. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition Unpaid Contractor Obligations in an amount not to exceed $5,000 on an interim basis, and to continue paying Independent Contractors on a postpetition basis in the ordinary course of the Debtors' business.

### d) Withholding Obligations

116. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments and other pre-tax deductions (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients. The Debtors deduct approximately $8,704 in the aggregate from Employees' paychecks on account of the Deductions on a semi-monthly basis.

117. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal and state income taxes, state disability insurance, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally funded to and processed by Paychex (the Debtors' third-party payroll service discussed below) who then remits the Payroll Tax to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed.

118.    As of the Petition Date, the Debtors do not believe they have any outstanding amounts owed on account of Deductions and Payroll Taxes (together, the "Withholding Obligations"). Out of an abundance of caution, however, the Debtors seek authority to pay any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business.

### e)  Payroll Processing

119.    The Debtors contract with Paychex, a third-party payroll service, to process and administer their payroll and reimbursements. Each semi-monthly pay period, the Debtors calculate the Employee Compensation for each Employee and drafts funds sufficient to satisfy such obligations to Paychex in advance of each applicable pay period. Paychex then distributes the Employee Compensation to the Employees on behalf of the Debtors. Failure to pay the Payroll Fees could lead to delayed disbursement of Employee Compensation and related benefits to the appropriate Employees, to the detriment of the Employees and the Debtors' operations.

120.    The Debtors pay approximately $1,966 per month to Paychex for the payroll-related services that it provides to the Debtors and related administrative costs (the "Payroll Fees"). As of the Petition Date, the Debtors do not believe they have any outstanding amounts owed on account of prepetition Payroll Fees. Out of an abundance of caution, however, the Debtors seek authority to pay any unpaid Payroll Fees that have accrued prior to the Petition Date in an amount not to exceed $2,000 on an interim basis, and to continue administering payroll in the ordinary course of business consistent with the Debtors' historical practices.

### f)  Reimbursable Expenses.

121.    In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically

include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties. The Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse the Expense Reimbursements likely would impose significant hardship on Employees.

122.     The Debtors pay on average Expense Reimbursements of approximately $7,127 per month. Due to the timing of when Employees submit expense reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date. Based on historical practice, however, the Debtors estimate that as of the Petition Date, the Debtors have accrued approximately $1,000 on account of pre-petition Expense Reimbursements, all of which will become due within the first 21 days of these Chapter 11 Cases. By this motion, the Debtors seek authority to pay any Employees' unpaid prepetition Expense Reimbursements in an amount not to exceed $1,500 on an interim basis, and to continue paying prepetition and postpetition Expense Reimbursements in the ordinary course of the Debtors' business on a postpetition basis.

### 2.  Employee Benefits

#### a)  Health Insurance Benefits

123.     The Debtors currently pay on behalf of their eligible Employees, up to $1,150 per month of health insurance benefit coverage, including coverage for medical, vision, dental, and life from MetLife (the "Insurance Allowance"). This amount is scheduled to increase to $1,200, effective on January 1, 2019 to account for rising insurance premiums. The Insurance Allowance may also be used for Flexible Savings Account ("FSA") Contributions, Health Spending Account ("HSA") Contributions, Dependent Care Contributions, and reimbursement for Medicare

Premiums. The Debtors currently pay approximately $22,888 per month on account of the Insurance Allowance directly to MetLife, California Choice, and Blue Cross Blue Shield. Any benefit coverage selected by the employee in excess of the Insurance Allowance is a payroll deduction from the Employee's paycheck. Employees may enroll in a single plan, a single plus one dependent plan, Employee and spouse plan, or a family contract beginning on their 31st day of employment. Participating Employees are covered under the medical insurance plan's prescription drug program. As of the Petition date, the Debtors do not believe they have any outstanding amounts owed on account of the Insurance Allowance. Out of an abundance of caution, however, the Debtors seek authority to pay any unpaid Insurance Allowance obligations that have accrued prior to the Petition Date in an amount not to exceed $23,000 on an interim basis, and to continue paying the Insurance Allowance in the ordinary course of business consistent with the Debtors' historical practices.

### b) Life and Accidental Death and Dismemberment Coverage & Long-Term Disability Insurance

124. The Debtors' full-time Employees receive basic life insurance and accidental death and dismemberment coverage ("Life and AD&D Coverage"), plus long-term disability insurance ("LTD"), under the Debtors' group insurance policy with MetLife. As part of the Insurance, the Debtors fund 100% of the premiums under these plans for Employees as part of their Insurance Allowance and if the Employee's coverage elections exceed the Insurance Allowance, such amounts are deducted from the Employee's paycheck. In an average month, the Debtors pay approximately $2,943 in premiums under these plans, payable monthly in advance. The Life and AD&D Coverage is up to a maximum of $100,000. LTD includes an elimination period of 90 days. The benefit pays 60% of an employee's pre-disability monthly earnings, not to exceed $6,000 per month. As of the Petition Date, the Debtors do not believe they have any

outstanding amounts owed on account of premiums under these plans. Out of an abundance of caution, however, the Debtors seek authority to pay any unpaid Life and AD&D Coverage obligations that have accrued prior to the Petition Date and to continue paying the Life and AD&D Coverage in the ordinary course of business consistent with the Debtors' historical practices.

125.    In addition, although the Debtors do not maintain a short-term disability insurance policy, the Debtors have historically offered, on a discretionary basis, compensation to a full-time Employee if the Employee becomes ill and unable to work as confirmed by the Employee's primary care physician or specialist physician in writing. Such eligible Employees will be entitled to receive, after first utilizing all of his or her accrued vacation and sick leave pay, a benefit equal to sixty percent (60%) of that Employee's hourly wage (based on a forty (40)-hour work week), and such benefit will continue until the Employee either returns to work or becomes eligible for his or her LTD benefits.

### c)  Workers' Compensation Program

126.    The Debtors maintain workers' compensation insurance for Employees at or above the levels required by law in California, Texas, New Jersey and New York (collectively, the "Workers' Compensation Program"). All Employees are entitled to participate in the Workers' Compensation Program. Currently, the Debtors maintain coverage under the Workers' Compensation Program through Travelers Insurance. The Debtors use a guaranteed cost program with no deductible but subject to year-end adjustments. The annual cost of the Workers' Compensation Program is approximately $37,765. The premiums are a subset of the Installment Payments as described in the Debtors' Insurance Motion and authority to make such payments is requested therein.

127. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these Chapter 11 Cases.[21] Their failure or inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. There are currently no open claims under the Workers' Compensation Program to which this would apply. To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors are requesting herein that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

### d) 401(k) Plan

128. The Debtors provide Employees with the ability to participate in a 401(k) defined contribution program (the "401(k) Plan"). Employees generally are eligible to participate in the 401(k) Plan one year after an Employee's date of hire. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). The 401(k) Plan currently is administered by Paychex.

---

[21] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

All administrative costs associated with the 401(k) Plan are deducted from the amounts contributed by the Employee.

129.    The Debtors match the Employees' 401(k) Plan contributions on a discretionary, dollar-for-dollar basis up to six percent (6%) of the Employees' compensation (collectively, the "401(k) Contributions"). The Debtors contribute approximately $12,600 per month on account of the 401(k) Contributions. The Debtors have funded the 401(k) Contributions through October 2018. As of the Petition Date, the Debtors estimate they have accrued approximately $5,000 on account of prepetition obligations with respect to the 401(k) Contributions, which are scheduled to be paid on November 20 payroll. Accordingly, the Debtors seek authority to pay any unpaid 401(k) Contributions that have accrued prior to the Petition Date in an amount not to exceed $7,000 on an interim basis, and to continue administering the 401(k) Plan in the ordinary course of business consistent with the Debtors' historical practices.

130.    Notably, many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions. As such, the Debtors believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates.

**e) Paid Leave.**

131.    The Debtors maintain several paid leave benefit programs for Employees, providing paid leave for Vacation, Sick Leave, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

132. In the ordinary course of business, the Debtors provide vacation hours ("Vacation") to Employees as a Paid Leave benefit. Vacation time accrues each pay period (i.e., semi-monthly) at the following rates:

| Years of Service | Annual Vacation Entitlement | Maximum Allowed Vacation Accrual | Semi- Monthly Accrual |
|---|---|---|---|
| 1 to 4 | 10 days/ 80 hours | 15.0 days/120 hours | 3.33 hrs |
| 5 to 10 | 15 days/120 hours | 22.5 days/180 hours | 5.00 hrs |
| After 10 | 20 days/160 hours | 30.0 days/240 hours | 6.66 hrs |

133. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid Vacation is approximately $209,963. This amount is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused Vacation in the event an Employee leaves the Debtors' employment.

134. In addition to Vacation time, the Debtors offer Employees who have completed 90 calendar days of service paid holiday time off. Holiday pay is calculated based at the Employee's straight time pay rate as of the date of the holiday multiplied by the number of hours the employee would otherwise have worked on that day. The Debtors also offer Employees who have completed 90 calendar days of service two floating paid holidays in each calendar year.

135. Additionally, in the ordinary course of business and in compliance with state laws, the Debtors provide sick leave ("Sick Leave") to the Employees as a Paid Leave benefit. Eligible employees receive a "lump sum" of 69.33 hours of paid Sick Leave on the 90th day of employment and on January 1 of each calendar year thereafter. Accrued, but unused sick leave will not be paid out at the end of employment and does not carry over year to year. Sick Leave may be used for diagnosis, care, or treatment of an existing health condition or preventive care for an Employee or an Employee's family member.

136.     The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law. The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, jury duty, and all legally required leaves, where applicable (collectively, the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

137.     The Debtors believe that the continuation of the broad-based Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these Chapter 11 Cases. To be clear, Employees will utilize any Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.  As required by California, however, the Debtors seek authority to pay out any unused vacation time to an Employee that ceases employment during the bankruptcy cases, provided that such amounts shall not exceed the statutory caps provided for in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**C.     Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief ("Utilities Motion").**

138.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, internet, water, and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies and their affiliates that provide Utility Services to the Debtors as of the Petition Date

the "Utility Services List") is attached to the Utilities Motion as Exhibit C.[22] The relief requested herein is requested with respect to all Utility Companies providing Utility Services to the Debtors.

139.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. The Debtors' businesses involve developing, producing, and marketing oil and the Debtors must maintain the ability to run their production equipment in a near-constant state. This requires a near-constant supply of electricity and natural gas. Most importantly, the Debtors require natural gas from BP Energy Company in the approximate amount of $533,693 a month that is vital to the Debtors' oil production process. In addition to the production processes conducted in the field, the Debtors operate a corporate office responsible for ensuring the smooth operation of the Debtors' business. This office requires electricity, natural gas, internet connectivity, telecommunications, water, and waste management services to operate. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption could jeopardize the Debtors' ability to manage their reorganization efforts. Accordingly, it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

140.     To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services. On average, the Debtors on a consolidated basis pay approximately $548,546 each month for third-party Utility Services. The Debtors project that their cost for Utility Services during the 30 days (not including any deposits to be paid) immediately following the Petition Date, however, will be approximately $570,000

---

[22]     The inclusion of any entity on, or the omission of any entity from, the Utility Services List is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights with respect to any such determination.

due to a planned outage at WPS to install a replacement generator stator. The WPS outage will require the Debtors to purchase electricity from public utility PG&E for an approximately two week period, at an increased cost.

141.    I believe uninterrupted Utility Services, and in particular KRH's gas supply from BP, are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. Accordingly, I believe it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

**D.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Obligations Owed to Holders of Mineral Interests and (II) Granting Related Relief ("Royalty Payments Motion").**

142.    The Debtors' operations are focused on the exploration, development and production of oil.  In general, the owner of real property in fee simple also owns an interest in any hydrocarbons (oil, gas and coal), hardrock minerals (gold, silver, copper and other metals) and other types of minerals contained in the property ("Mineral Interests").  Absent contracts with third parties, only owners of real property have the exclusive right to extract or mine any hydrocarbons or minerals in the property.  Through a written agreement, owners of Mineral Interests can sell or otherwise convey the exclusive right to extract minerals (a "Working Interest") to a third party in exchange for either a share of production or payments in lieu of a share of production (a "Royalty Interest").

143.    The Debtors operate and have Working Interests in six (6) oil leases (the "Leases") in Kern County, California.  There are approximately 191 wells on the Leases (the

"Wells"), all of which the Debtors operate, and approximately 124 of these Wells are producing. There are no holders of non-operating working interests in the Debtors' leases.

144.     The Debtors' Leases entitle the lessors to Royalty Interests.   Specifically, the Debtors must remit to their lessors certain royalties—generally defined as a "share of production, free of expenses of production"[23]—from the producing Wells located on such Leases (the "Royalties").  Where the Debtors are not producing oil, in lieu of a Royalty they must remit shut-in royalties to keep the Lease in effect (the "Shut-In Payment").  KRH also pays an overriding royalty interest ("ORRI") on all production from the Nukern property to the former owner of the Nukern property, Kern USA, Inc. ("KUI"), of $1 per barrel gross production for each barrel produced from 2 million barrels to 4 million barrels.  The 2 million barrel mark was reached in July 2016 and, to date, approximately 3.11 million barrels has been produced from the Nukern property, resulting in royalty payments paid to KUI in the amount of $1.1 million.  The Nukern property currently has an additional 886,000 barrels remaining before it reaches 4 million barrels and KUI's royalty interest is fully paid.  KRH anticipates hitting the 4-million barrel mark in February 2020.

145.     Failure to forward all required amounts to holders of Royalty Interests as and when due could have a material adverse effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of oil leases, penalties and interest, initiation of litigation, including turnover actions, conversion and constructive trust claims, and assertion of significant secured claims against property of the Debtors' estates, and, in certain circumstances, attempted removal of the Debtors as operator.

---

[23] 8-R Howard R. Williams & Charles J. Meyers, Oil and Gas Law R (Matthew Bender 2015).

146.    The amount of Royalty Interests owed to holders of Leases in a given month is subject to variation due to many factors, including the specific terms of the Leases, changes in ownership, and changes in the amount or type of minerals captured. The Debtors generally pay Royalties in an aggregate amount of approximately $800,000 per month and Shut-In Payments of $530 per month. These payments are remitted by the Debtors throughout the course of a given month. As a result of the significant accounting process required each month to accurately disburse the resulting proceeds, Royalties and Shut-In Payments generally are paid on or before the 25th of each month following the end of the month in which production of the underlying oil occurred.  If a mineral interest owner does not have a California address, the Debtors withhold taxes from their Royalty interest and remit such taxes to California at the end of each year. The Debtors anticipate they will be required to remit approximately $50,000 in withholding taxes in January 2019.

147.    The Debtors estimate that, as of the Petition Date, there is approximately $800,000[24] outstanding on account of Royalty Interests and $530 of Shut-In Payments owed to holders of Leases, with the entirety of that amount due November 25, 2018, within the first 21 days of these Chapter 11 Cases. Accordingly, the Debtors request approval to pay up to $900,000 to holders of Mineral Interests upon entry of the Interim Order, and to continue honoring such prepetition Royalties and Shut-In Payments in the ordinary course of business on a postpetition basis.

---

[24]    This amount is in addition to approximately $373,636 in "suspended funds" that are Royalties due and owing to certain holders of Royalty Interests but are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest. Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the suspended funds to particular holders of Royalty Interests is resolved, the Debtors will release the suspended funds in question.

**E.** **Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Assume Brush Agreement Under Section 365 of the Bankruptcy Code (the "Motion to Assume").**

148.    On May 24, 2018, WPS entered into the Brush Agreement for the purchase and installation of a generator Stator. The Stator is a necessary component of the generator that WPS uses to produce electricity from steam, and is thus integral to WPS's operations. Replacement of the Stator was recommended following a detection of certain imperfections in the currently installed stator core. Until the Stator is replaced, the Debtors' insurer will not insure the 22.222MVA Brush generator.

149.    The Stator shipped on October 16, 2018 and is scheduled for delivery to WPS on between November 9 and December 3, 2018, depending on customs clearance, with installation expected to begin immediately thereafter. WPS received an invoice in the amount of $850,000.00 for the Stator on October 26, 2018, with payment due within 30 days.

150.    To allow for the installation of the Stator, WPS is scheduled to be offline from November 27, 2018 through December 15, 2018. WPS specifically timed the delivery and installation of the Stator for this period to take advantage of PG&E's scheduled mandatory transmission outage of the 115kV substation serving WPS, which will run from November 27, 2018 through December 8, 2018. This downtime, though necessary, will result in a 5.5% decline in WPS's total annual revenue. Were Brush to refuse to deliver and install the equipment due to the amounts outstanding under the Brush Agreement, there would be a number of negative consequences, including that (1) WPS would need to procure a replacement for the Stator, (2) WPS would be unable to insure the 22.222MVA Brush generator until the Stator is replaced, and (3) WPS is unable to cancel the scheduled outage with PG&E, resulting in lost revenue both in early December *and* when the replacement generator stator is ultimately delivered and installed.

151. Recognizing the necessity of the purchase and installation of the Stator, the Debtors and their prior secured lenders, AB and GS, entered into amendments to both their First Lien Credit Agreement and Second Lien Credit Agreement, effective as of June 19, 2018, whereby the Debtors' secured lenders specifically authorized WPS to purchase this equipment, deemed "necessary for the conduct of operations by [WPS]."

152. Pursuant to the Motion to Assume, the Debtors seek entry of an order authorizing the Debtors to assume their executory contract with Brush GMS for the purchase and installation of the Stator, a necessary component of WPS's generator. WPS specifically timed the manufacture and delivery of the Stator to take advantage of a scheduled outage of PG&E, which purchases electricity from WPS. Prompt assumption of the Brush Agreement will minimize the impact of generator downtime on WPS's utility revenue by allowing delivery and installation of the Stator to proceed as currently scheduled.

153. Emergency consideration of the Motion to Assume is necessary to avoid immediate and irreparable harm to the Debtors' estates. If Brush refuses to deliver and install the Stator when it arrives at port due to the outstanding amounts due under the Brush Agreement, WPS would not only need to find a replacement for the Stator, but it would also be unable to cancel the scheduled outage—requiring it to schedule another installation, at a further loss of revenue, in the future. Failure to promptly assume the Brush Agreement would also result in additional costs to KRH, which purchases from WPS—at a discount—both electricity and waste heat to generate and supply steam to aid KRH's extraction of oil. Thus, granting the relief requested in the Motion to Assume will benefit the Debtors' estates and avoid immediate and irreparable harm.

**F.**   **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief ("Taxes Motion").**

154.   Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these Chapter 11 Cases. The Debtors estimate that approximately $1.2 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date. Of this amount, approximately $45,000 will become due in the first 21 days of the Bankruptcy Cases.

155.   In the ordinary course of their business, the Debtors collect, withhold, and incur sales, use, excise, income, withholding, franchise, severance, and property taxes, as well as other business, environmental, and regulatory fees (collectively, the "Taxes and Fees").[25] The Debtors remit the Taxes and Fees, on a periodic basis (monthly, quarterly, semiannually, or annually depending on the nature and incurrence of a particular Tax or Fee) to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities"). A schedule identifying the Authorities is attached to the Taxes Motion as Exhibit C.[26] Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions. The Debtors estimate that approximately $1.2 million in Taxes and Fees relating to the prepetition period will become due and payable after the Petition Date with approximately $55,000 due during the first 21 days of the bankruptcy cases. The Debtors' Taxes and Fees are described in greater detail below.

---

[25]   By this motion, the Debtors do not seek the authority to collect and remit state and federal employee-related taxes and withholdings. Such relief is instead requested in the Wages Motion.

[26]   Although Exhibit C is intended to be comprehensive, the Debtors may have inadvertently omitted Authorities from Exhibit C. By this motion, the Debtors request relief with respect to Taxes and Fees payable to all Authorities, regardless of whether such Authority is specifically identified on Exhibit C to the Taxes Motion.

### 1. Sales, Use, and Excise Taxes

156.    The Debtors incur, collect, and remit sales and excise taxes to the Authorities in connection with the sale and distribution of their production. Additionally, the Debtors purchase a variety of equipment, materials, and supplies necessary for the operation of their businesses from vendors that may not operate in the state where the property is to be delivered and therefore do not charge the Debtors sales tax in connection with such purchases. In these cases, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Authorities. The Debtors generally remit sales, use, and excise taxes on a monthly or quarterly basis following their collection.

157.    In 2017, the Debtors paid approximately $5,000 in the aggregate on account of sales, use, and excise taxes to the Authorities that were remitted to the State of California. In addition, vendors invoiced the Debtors for sales tax owed in conjunction with the Debtors' purchase of goods and remit such sales tax to the authorities on the Debtors' behalf. Typically, such amounts are listed as separate line items on invoices. As a result, the Debtors cannot accurately estimate the sales tax remitted to the Authorities on their behalf. The Debtors estimate that no such taxes will become due and payable in the first 21 days of these Chapter 11 Cases. Out of an abundance of caution, the Debtors, by this Motion, seek authority, but not direction, to pay any sales, use, or excise taxes that have accrued before the Petition Date in an amount not to exceed $5,000 on an interim basis, and to continue paying sales, use, or excise taxes on a postpetition basis in the ordinary course of business.

### 2. Income and Withholding Taxes

158.    In the ordinary course of operating their businesses, the Debtors are subject to state and federal income taxes. In 2017, the Debtors did not pay any federal or state income

taxes due to significant net losses from operations. As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of federal or state income or withholding taxes. Nevertheless, out of an abundance of caution, the Debtors request authorization to continue paying federal income and withholding taxes on a postpetition basis in the ordinary course of business.

### 3. Franchise Taxes

159. The Debtors are required to pay various state franchise taxes in order to continue conducting their businesses pursuant to applicable state laws. The Debtors typically pay the franchise taxes on an annual basis, depending on when the relevant Authority charges the franchise tax. In 2017, the Debtors did not pay franchise taxes due to net losses from operations. As of the Petition Date, the Debtors do not believe any amounts are outstanding on account of franchise taxes. Nevertheless, out of an abundance of caution, the Debtors request authorization to continue paying franchise taxes on a postpetition basis in the ordinary course of business.

### 4. Ad Valorem Taxes

160. State and local laws in the jurisdictions in which the Debtors operate generally grant Authorities the power to levy property and ad valorem taxes against the Debtors' real and personal property. To avoid the imposition of statutory liens on their real and personal property, the Debtors typically pay such taxes in the ordinary course of business on an annual basis. The Debtors received a tax assessment from the Kern County Treasurer for 2018 in which they owe $816,000 in accrued and unpaid ad valorem taxes to Kern County Treasurer, approximately $408,000 of which will become due December 10, 2018 and the remainder will come due in April 2019. By this motion, the Debtors seek authority, but not direction, to pay any property

taxes that have accrued before the Petition Date, and to continue paying property taxes on a postpetition basis in the ordinary course of business.

### 5. Severance Taxes

161.   California, where the Debtors operate, imposes a severance tax, which is a tax on "severing" natural resources, such as oil, from the land or waters within a state or jurisdiction. Severance taxes vary by state, but in California severance taxes are calculated as a percentage of barrels of oil or thousand cubic feet of gas produced. The Debtors pay severance taxes on an annual basis. For calendar year 2017, the Debtors were assessed severance taxes in the amount of $455,972.70. Pursuant to the terms of the assessment, KRH paid approximately half of the assessed severance taxes on or before August 15, 2018 and the remaining amount of $227,986.35 is due on or before February 1, 2019. Thus, as of the Petition Date, the Debtors estimate that they owe approximately $227,986.35 to the relevant Authorities on account of prepetition severance taxes, none of which will become due and owing during the first 21 days of these Chapter 11 Cases. By this motion, the Debtors seek authority, but not direction, to pay any severance taxes that have accrued before the Petition Date, and to continue paying severance taxes on a postpetition basis in the ordinary course of business.

### 6. Miscellaneous Fees and Import Duties

162.   The Debtors incur a variety of fees related to environmental and conservation laws and regulations, business licensing and annual report fees, permitting, participation in state regulatory agencies and boards, as well as potential fines for non-compliance with laws, ordinances or regulations (collectively, the "Misc. Fees").

163.   Additionally, the Debtors remit certain Misc. Fees required to be paid pursuant to applicable laws and regulations where the Debtors operate. In 2017, the Debtors paid

approximately $40,000 on account of such Misc. Fees. Historically, the Debtors have paid such Misc. Fees as they arise in the ordinary course of their business. As of the Petition Date, the Debtors are not aware of any prepetition Misc. Fees but, out of an abundance of caution, seek the authority, but not direction, to pay any Misc. Fees that have accrued before the Petition Date not to exceed $5,000 on an interim basis, and to continue paying Misc. Fees on a postpetition basis in the ordinary course of business.

164.     The Debtors also incur duties related to importing equipment and goods ("Import Duties"). The Debtors anticipate that approximately $28,800 in Import Duties for the delivery of a steam turbine as further detailed in the Debtors' Motion to Assume filed contemporaneously herewith and described in the First Day Declaration, plus handling fees in approximate amount of $15,000, will become due within 21 days of the Petition Date. Accordingly, the Debtors seek, by this motion, authority, but not direction, to pay any Import Duties that have accrued before the Petition Date not to exceed $45,000 on an interim basis, and to continue paying Fees on a postpetition basis in the ordinary course of business.

### 7.  Summary of Relief Requested

165.     Although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek authority pursuant to this motion to make such payments where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these Chapter 11 Cases.

166. The Debtors believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. *First,* failing to pay certain of the Taxes and Fees, could cause the Debtors to lose their ability to conduct business in certain jurisdictions. *Second,* the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process. *Third,* failing to pay Taxes and Fees potentially could subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors' restructuring. *Fourth,* unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses or the reorganization process. Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates. Finally, certain unpaid Taxes and Fees will need to be paid as part of a plan of reorganization in these cases.

167. I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. *First*, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process. *Second*, failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. *Third*, failing to pay certain of the Taxes and Fees, particularly franchise taxes, would likely cause the Debtors to lose their ability to conduct business in certain jurisdictions. *Fourth*, I believe unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively

impact the Debtors' business. Finally, the U.S. Trustee requires that Debtors pay all tax obligations arising after the filing of the petition in full when due.

168.     In light of the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be approved.

**G.     Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (V) Granting Related Relief ("Insurance Motion").**

169.     Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business on a post-petition basis.

170.     In the ordinary course of business, the Debtors maintain seventeen (17) insurance policies that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers"). These policies provide coverage for, among other things, the Debtors' general liability, employee benefits liability, workers' compensation, property, control of wells, automobile liability, pollution liability, director and officer liability and excess umbrella liability (collectively, the "Insurance Policies"). A schedule of the Insurance Policies, including the

policy number, coverage limits, annual premiums and policy terms, is attached to the Insurance Motion as Exhibit C.[27]

171.    The aggregate annual premium for the Insurance Policies is $703,094.26, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions. The Insurance Policies generally are one year in length (although certain policies may be longer than one year based on market conditions and availability at the time) and renew at various times throughout the year.

172.    The Debtors primary insurance provider is Travelers, which provides the Debtors with General Liability (Oil/Gas), Automobile, Property, Employee Benefits Liability, Workers' Compensation and a $5 Million Umbrella Policy. The Debtors renewed their Traveler's policies as of October 26, 2018, but have yet to receive the first invoice on account of this renewal in the amount of $8,363.80 (the "Travelers Invoice"), which will be due in the first 21 days of these Chapter 11 Cases. The balance of the premiums for the policies with Travelers Insurance will be due in monthly installments (the "Installment Payments") for a total aggregate payment of $83,420.

173.    In addition to the Travelers' policies, the Debtors also have a number of policies with other insurers, including, among other policies, a General Liability and $5 Million Umbrella with Chubb, a $5 Million Umbrella policy with CRC/Arch, a Director and Officer Liability Policy through Hiscox, a Control of Wells Policy with Lloyds and a Pollution Liability Policy

---

[27]    The descriptions of the Insurance Policies set forth in the Insurance Motion constitute a summary only. The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this motion. Out of an abundance of caution, the Debtors request authority to honor obligations and renew all insurance policies, as applicable, regardless of whether the Debtors inadvertently fail to include a particular insurance policy on Exhibit C to the Insurance Motion, and any such omitted insurance policy is hereby included in the defined term "Insurance Policies" as used herein and in the Order.

with Everest. The full schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit C, including the policy number, coverage limits, annual premiums and policy terms.

174.    As noted above, as of the Petition Date, the Debtors owe $8,363.80 to Travelers on account of the Travelers Invoice, which will become due within the first 21 days of these Chapter 11 Cases.  This is the only insurance-related amount the Debtors believe will come due in the first 21 days of the cases.  The Debtors thus seek authority to pay any amounts owed, to ensure uninterrupted coverage under their Insurance Policies, up to $10,000 on an interim basis, and to continue to honor the insurance premiums in the ordinary course of business.

175.    The Debtors obtain the Insurance Policies through two different brokers (the "Brokers").  Kern Insurance Associates is the Debtors' primary broker, and Aon is the broker for the Debtors' Director and Officer Liability Policy. The Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods. The Brokers collect commission payments for services rendered in addition to or as part of the premiums paid on the Insurance Policies (the "Broker Fees"). As of the Petition Date, the Debtors do not believe that they owe any amounts to the Brokers on account of prepetition Broker Fees. To the extent any such prepetition amounts are determined to remain outstanding, the Debtors seek authority to honor any Broker Fees in full, in cash to ensure uninterrupted coverage under their Insurance Policies.

176.    I believe that continuation of the Insurance Policies and entry into new insurance policies and premium financing agreements, as required in the ordinary course of business, is

essential to the preservation of the value of the Debtors' properties and assets. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

**H.    Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures For Transfers of Equity Securities and (II) Establishing A Record Date For Notice And Sell Down Procedures For Trading In Claims Against The Debtors' Estates (the "Trading Procedures Motion").**

177.    The Debtors have generated, and are currently generating, a significant amount of tax attributes for U.S. federal income tax purposes. The Debtors, and particularly KRH, have experienced losses from the operation of their businesses since 2003. As a result, the Debtors utilizable federal income tax net operating losses ("NOLs") through 2017 are approximately $75.8 million on a consolidated basis, consisting of approximately $13.5 million of NOLs by AAOG, $60.8 million at KRH, and $1.5 million at WPS. Further, as of September 30, 2018, the Debtors estimate that their total NOLs have increased to $80.2 million, which such amount is likely to be even higher when the Debtors emerge from chapter 11. The Debtors' NOLs are a valuable asset because the Debtors generally can carry forward their NOLs to reduce or eliminate their income tax liability, thereby potentially freeing up funds to meet working capital requirements and service debt. In particular, the NOLs may be available to the Debtors to offset taxable income generated by ordinary course activity and other transactions completed during the course of these Chapter 11 Cases. Additionally, the Debtors can carry forward the NOLs and credits to reduce their future tax liability, thereby potentially preserving cash for the benefit of their estates.

178.    It is my understanding that the Debtors' ability to use its Tax Attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of its equity securities and claims against the Debtors prior to consummation of a chapter 11 plan. The Debtors thus seek to establish procedures for

continuously monitoring the trading of its equity securities and provide notice of the potential that it will seek certain sell-down procedures for claims so that the Debtors can preserve their ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of their NOLs under Section 382. Therefore, I submit that the relief requested in the Trading Procedures Motion is appropriate and in the best interests of the Debtors' estates, their creditors and other parties in interest.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 12, 2018

_____
Patrick R. Morris
President
All American Oil & Gas Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2018, a true and correct copy of the foregoing document was served by electronic mail and/or U.S. overnight mail to the following parties and the parties on the service list attached hereto:

Office of the U.S. Trustee
615 E. Houston St., #533
San Antonio, TX 78205
USTPRegion07.SN.ECF@usdoj.gov

O'Melveny & Myers LLP
c/o Mr. Stephen H. Warren
Times Square Tower
7 Times Square
New York, NY 10036
swarren@omm.com

California Environmental Protection Agency
1001 I Street
P.O. Box 2815
Sacramento, CA 95812-2815

U.S. Security and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

                                        /s/ Deborah D. Williamson
                                        Deborah D. Williamson

AB PRIVATE CREDIT INVESTORS LLC
ATTN: KERN RIVER HOLDINGS SECURITY
ACCOUNT MANAGER
1345 AVENUE OF THE AMERICAS
NEW YORK, NY 10105

AB PRIVATE CREDIT INVESTORS, LLC
C/O CORTLAND CAPITAL MARKET SERVICES LLC
ATTN: AGENCY SERVICES -ALLIANCEBERNSTEIN PRIVATE
CREDIT INVESTORS LLC
225 W WASHINGTON STREET, 21ST FLOOR
CHICAGO, IL 60606

AIR QUALITY CONSULTANTS INC
15541 COMMERCE LANE
HUNTINGTON BEACH, CA 92649

ALL AMERICAN OIL & GAS, INC.
9601 MCALLISTER FREEWAY, SUITE 221
SAN ANTONIO, TX 78216

APT GENERAL ENGINEERING INC
PO BOX 2124
BAKERSFIELD, CA 93303

B J INC CALIFORNIA CORPORATION
4101 UNION AVENUE
BAKERSFIELD, CA 93305

BAKER HUGHES
PO BOX 301057
DALLAS, TX 75303-1057

BOLLES WELL SERVICE
4008 SHAWN STREET
BAKERSFIELD, CA 93312

BP ENERGY COMPANY
FRANK VERDUCCI
MANAGING DIRECTOR –
GLOBAL STRUCTURED PRODUCTS
201 HELIOS WAY
HOUSTON, TX 77079

BRIGHTON BEACH ENTERPRISE INC
PO BOX 20519
BAKERSFIELD, CA 93390

BRUSH SEM S R O
EDVARDA BENESE 564/39
PLZEN 30100
CZECH REPUBLIC

CA DEPARTMENT OF CONSERVATION
DIV OF OIL GAS & GEOTHERMAL
RESOURCES
601 K STREET MS 18-05
SACRAMENTO, CA 95814-3530

CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
MATTHEW RODRIQUEZ, SECRETARY
1001 I STREET
PO BOX 2815
SACRAMENTO, CA 95812-2815

CALIFORNIACHOICE
BENEFIT ADMINISTRATORS
PO BOX 7088
ORANGE, CA 92863-7088

CAMDEN FINANCIAL SERVICES, INC.
C/O ALAN J. KESSEL
PEPPER HAMILTON LLP
4 PARK PLAZA, STE. 1200
IRVINE, CA 92614

DARRELL THOMPSON TANK & CONSTRUCTION INC
PO BOX 5788
BAKERSFIELD, CA 93388

DELAWARE DEP'T OF JUSTICE
MATT DENN, ATTORNEY GENERAL
CARVEL STATE BUILDING
820 N FRENCH ST.
WILMINGTON, DE 19801

DYKEMA GOSSETT PLLC
DEBORAH D WILLIAMSON
PATRICK L HUFFSTICKLER
112 E PECAN STREET, SUITE 1800
SAN ANTONIO, TX 78205

ENTERPRISE DRILLING FLUIDS
PO BOX 20519
BAKERSFIELD, CA 93390

ENVIRONMENTAL PROTECTION AGENCY
REGION 6
FOUNTAIN PLACE 12TH FLOOR, STE 1200
1445 ROSS AVENUE
DALLAS, TX 75202-2733

GE PACKAGED POWER LLC
PO BOX 100371
ATLANTA, GA 30384-0371

GEOGUIDANCE DRILLING SERVICES
PO BOX 42647
BAKERSFIELD, CA 93384

GROTEFELD, HOFFMANN, SCHLEITER, GORDON, OCHOA &
EVINGER, LLP
C/O MR. ANOOJ M. THAKRAR
SHEPHERD MOUNTAIN PLAZA
6034 WEST COURTYARD DRIVE, SUITE 200
AUSTIN, TX 78730

HOGAN LOVELLS US LLP
JOHN D BECK
609 MAIN ST.
SUITE 4200
HOUSTON, TX 77002

HOGAN LOVELLS US LLP
RICHARD L WYNNE
ERIN N BRADY
1999 AVENUE OF THE STARS, SUITE 1400
LOS ANGELE S, CA 90067

INTERNAL REVENUE SERVICE
SPECIAL PROCEDURES-INSOLVENCY
PO BOX 7346
PHILADELPHIA, PA 19101-7346

J ARON & COMPANY LLC
200 WEST STREET
TAX DEPARTMENT (FEDERAL)
NEW YORK, NY 10282

JAMES SHANNON
PO BOX 333
ILWACO, WA 98624

KERN CAL OIL 7 LLC
1223 WILSHIRE BLVD, #1050
SANTA MONICA, CA 90403

KERN RIVER HOLDINGS, INC.
9601 MCALLISTER FREEWAY, SUITE 221
SAN ANTONIO, TX 78216

KERN USA INC
NORFOLK HOUSE
31 ST JAMES'S SQUARE
LONDON, EN SW1Y4JR

KEY ENERGY SERVICES
PO BOX 4649
HOUSTON, TX 77210-4649

KIA INSURANCE ASSOCIATES INC
PO BOX 11390
BAKERSFIELD, CA 93389-1390

KINGS OIL TOOLS INC
2235 SPRING STREET
PASO ROBLES, CA 93446

MARK SHEFFIELD CONSTRUCTION
9105 LANGLEY RD
BAKERSFIELD, CA 93312

MICHAEL AMUNDSEN, TRUSTEE
AMUNDSEN FAMILY TRUST
2990 DOGWOOD CIRCLE
ST GEORGE, UT 84790

MIDAS PUMP & SUPPLY
PO BOX 81677
BAKERSFIELD, CA 93380

MMI SERVICES INC
4042 PATTON WAY
BAKERSFIELD, CA 93308-5030

O'MELVENY & MYERS LLP
C/O MR. STEPHEN H. WARREN
TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NY 10036

OFFICE OF THE ATTORNEY GENERAL
1300 I STREET
SACRAMENTO, CA 95814-2919

PETROL PRODUCTION SUPPLY
11000 BRIMHALL ROAD, STE E-52
BAKERSFIELD, CA 93389

PRO TOOL SERVICES INC
1704 SUNNYSIDE COURT
BAKERSFIELD, CA 93308

SAN JOAQUIN BIT SERVICE
PO BOX 40185
BAKERSFIELD, CA 93384

SECRETARY OF DNREC
THE RICHARDSON & ROBBINS BLD'G
89 KINGS HIGHWAY
DOVER, DE 19901

SECURITIES AND EXCHANGE COMMISSION
801 CHERRY STREET
SUITE 1900, UNIT 18
FORT WORTH, TX 76102

SHELL TRADING US COMPANY
PO BOX 4604
HOUSTON, TX 77210-4604

TRB OILFIELD SERVICES INC
PO BOX 82276
BAKERSFIELD, CA 93380

U S ATTORNEY'S OFFICE
601 NW LOOP 410, SUITE 600
SAN ANTONIO, TX 78216

U S TRUSTEE OFFICE
NANCY RATCHFORD, ASSISTANT U S TRUSTEE
615 E HOUSTON ST #533
SAN ANTONIO, TX 78205

USEPA WILLIAM JEFFERSON
CLINTON BUILDING NORTH (WJC NORTH)
1200 PENNSYLVANIA AVENUE N W
WASHINGTON, DC 20004

VINSON & ELKINS LLP
JAMES K LONGHOFER, ESQ
1001 FANNIN STREET, SUITE 2500
HOUSTON, TX 77002

WESTERN POWER & STEAM, INC.
9601 MCALLISTER FREEWAY
SUITE 221
SAN ANTONIO, TX 78216

# Exhibit "A"






# Steamflooding Keeps California Field Producing 117 Years Later

Scott Weeden, Senior Editor, Drilling Friday, April 1, 2016 - 8:00am



The Kern River Oil Field was 11 years old when this photo was taken in 1910. Today the field has more than 10,000 wells producing at an average depth of 274 m (900 ft). (Source: Kern County Museum)

The discovery well for the Kern River Oil Field was hand-dug in May 1899 in the San Joaquin Valley in Kern County, Calif. The Kern River Oil Field had produced about 2.2 Bbbl of heavy oil by year-end 2014, one of the top five U.S. oil fields.

In 1901 the Kern River Oil Field was producing 12,000 bbl/d. The field was still producing at a rate of about 70,000 bbl/d in 2014. The discovery well on the Means Ranch was plugged and abandoned in 1995.

A California Historical Landmark marker at the well site said, "Oil was discovered at 70 ft [21 m] in 1899, when Tom Means persuaded Roy Elwood and Frank Wiseman, aided by Jonathan, Bert, Jud and Ken Elwood, George Wiseman, and John Marlowe, to dig here for oil. On June 1, 1899, 400 ft [122 m] to the north, Horace and Milton McWhorter drilled this region's fi rst commercial well."



Some of the early explorers in the Kern River Oil Field are shown. The field was discovered on the Means Ranch in 1899. (Source: Kern County Museum)

A quote in the "History of Kern County, California" described the 1904 market, which sounds a lot like today, "Oil men estimated that under 25 cents per barrel they could not produce oil, pay expenses and set aside the sinking fund to meet the value of their investments against the time the wells went dry."

On May 18, 1999, Texaco celebrated the 100th anniversary of the discovery of the Kern River Oil Field by Jonathan and James Elwood. "In May 1899 the father and son team used shovels and hand augers to dig a single 45-ft-deep [14-m-deep] well, which was the first of many in this prolific oil field," according to a press release.

In the "History of Kern County, California," Jonathan Elwood took much more of the credit for discovering the field. "Means for a long time past had been seeking to interest someone in the oil prospects on the north side of the river. Accordingly he was only too glad to give James Elwood a favorable lease, and Elwood wrote to his father, Jonathan Elwood, who was living in Fresno County and who was an old prospector, to come and help him find the Kern River oil.

"In a letter to the *California Oil World* published Aug. 24, 1911, Jonathan Elwood tells the story of the discovery in these words: 'James Munroe Elwood and I, Jonathan Elwood, alone and without the assistance of anyone, discovered oil on the north bank of Kern River, 7 miles [11 km] northeast of Bakersfield on Thomas A. Means' farm. This was in May 1899. We made the discovery with a hand auger, under the edge of a cliff, close to the river.

'We then went up onto the bluff and commenced a shaft, and at the depth of 43 ft [13 m] we again struck the oil sand. We were then obliged to get timber and curb as we went down, as the oil sand was too soft to stand up. We were obliged to put in an air blast to furnish fresh air to the man below on account of the strong odor of gas. At a depth of 75 ft [23 m] there was so much oil and gas that we concluded we had better get a steam rig. We got this and went down 343 ft [104 m],'" the history stated.

"The first oil taken away was when I took four whiskey barrels of it to Kern City and shipped it to Millwood for skid grease, getting $1 a barrel net," he said.

### Geology
The Kern River Oil Field has one large producing horizon (Kern River) and two smaller formations, the Vedder and Jewett, discovered in 1981 and 1985, respectively. The Kern River Formation is of Pliocene-Pleistocene age and lies at depths between 122 m and 400 m (400 ft and 1,312 ft). The Vedder is at a depth of 1,433 m (4,700 ft) in the Oligocene, and the Jewett is at 1,287 m (4,220 ft).

## Technology extends field's life

A lot of technology, including steamflooding, cogeneration, the reclamation and reuse of produced water, and 3-D visualization were used to meet the challenges of producing heavy crude oil with a goal of extracting more than 80% of the crude oil contained in the field, Texaco said.

The Kern River Oil Field consists of 10,750 acres in an area north-northeast of Bakersfield, Calif. In the early to mid-1960s hot water injection and steamflooding revitalized the Kern River Field.

Chevron has a 99%-owned and operated interest in leases covering most of the Kern River Oil Field. With 86% of the company's crude oil production in California considered heavy oil (typically with lower than 22°API gravity), thermal recovery techniques utilizing steam are applied to increase oil recovery.

"The company's industry-leading expertise in steamflood operations has resulted in more than a 60% crude oil recovery rate at the Kern River Oil Field. Chevron continues to leverage leading-edge heat management capabilities in the recovery of these hydrocarbons, with emphasis on improved energy efficiency through new technology and processes," the company stated in its 2014 annual report supplement.

In 2014 the company drilled 779 new wells, and development programs included plans for drilling 520 more wells in 2015. These programs have helped reverse the decline rate on company-operated properties from 7% in 2010 to essentially flat in 2014.

## Water, oil do mix

For every barrel of oil produced in the Kern River Oil Field, about 10 bbl of water are produced. The field produces about 760,000 bbl/d of water. About half of that amount flows through a 14-km (8.5-mile) pipeline from a water processing facility to Bakersfield's Cawelo Water District. Given the recent drought in California, the recycled water has been a blessing to farmers in the southern San Joaquin Valley.

In 1994, Texaco (now Chevron) entered into a contract with the Cawelo Water District to provide excess produced water to Cawelo for irrigation purposes. The water that Chevron provides to Cawelo for agricultural purposes benefits about 90 farmers and is used primarily with permanent crops such as citrus fruits, nuts and grapes, according to a Chevron spokesperson.

After being separated from oil by gravity separation, produced water runs through depurators, which remove fine particulates and oil, and walnut-shell media-based filters to clean remaining residual oil before traveling through an underground pipeline to a surface polishing pond.

From the pond, the processed water proceeds into Cawelo's blending reservoir, known as "Reservoir B," where Chevron's water mixes with freshwater and processed water from other sources, including the Valley Water Management Co. The newly blended water is then sent through Cawelo's canal system, where additional freshwater is added and farmers are then able to draw water for irrigation.

# Recommended



**EXPLORATION**

Oil Companies Step Up Exploration Drilling Off Vietnam



**LAND & LEASING**

ExxonMobil to Offload Stakes in Production Fields in More Than...



**OPERATIONS**

ExxonMobil to Offload Stakes in Production Fields in More Than...



**WILDCATS & STEPOUTS**

ExxonMobil Makes Large Oil Discovery Offshore...



**DIGITAL**

Seismic, Log Target Large Deepwater Prospect

# Exhibit "B"

1  MANATT, PHELPS & PHILLIPS, LLP
   ROBERT H. PLATT (Bar No. CA 108533)
2  rplatt@manatt.com
   LEAH R. ADAMS (Bar No. CA 266645)
3  ladams@manatt.com
   11355 West Olympic Boulevard
4  Los Angeles, CA 90064-1614
   Telephone: (310) 312-4000
5  Facsimile: (310) 312-4224

6  *Attorneys for Claimant*
   CAPPELLO CAPITAL CORP.

7

8             IN ARBITRATION BEFORE THE

9       FINANCIAL INDUSTRY REGULATORY AUTHORITY

10

| 11 | CAPPELLO CAPITAL CORP., a California corporation, | Case No. |
|---|---|---|
| 12 | | **STATEMENT OF CLAIM FOR:** |
| 13 | Claimant, | (1) **VIOLATION OF CALIFORNIA PENAL CODE SECTION 502;** |
| 14 | vs. | (2) **BREACH OF FIDUCIARY DUTY;** |
| 15 | CARY MEADOW, an individual, residing in the State of California, CHANNEL INVESTMENT ADVISORS, INC., a California corporation, and PAUL KROMWYK, an individual, residing in the State of California, | (3) **MISAPPROPRIATION OF CONFIDENTIAL INFORMATION;** (4) **CONVERSION;** (5) **FRAUD;** (6) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 16 | | |
| 17 | | |
| 18 | Respondents. | (7) **INTENTIONAL INTERFERENCE WITH CONTRACT;** (8) **CONSTRUCTIVE TRUST; AND** (9) **ACCOUNTING** |

19

20

21

22

23

24

25

26

27

28

1    Claimant Cappello Capital Corp. ("Claimant" or "Cappello Capital") for its Statement of

2    Claim herein, states and alleges as follows:

3    ### THE PARTIES

4    1.    Claimant (CRD # 30124) is a California corporation with its principal place of

5    business in Santa Monica, California.  Claimant provides a wide variety of investment banking

6    services.  Until January 2014, Claimant was a FINRA-registered broker-dealer.  Claimant has

7    standing to bring this action as a member, pursuant to Section 13100 of the Code of Arbitration

8    Procedures for Industry Disputes.  Claimant's employees were registered with FINRA as

9    Registered Representatives of Claimant.  Since January 2014, certain of Claimant's previously-

10   registered representatives have associated with another FINRA-registered broker-dealer.

11   2.    Claimant is affiliated with Cappello Group, Inc. ("Cappello Group").

12   Professionals at Cappello Capital and Cappello Group work closely together to service the clients

13   of Cappello Capital.  Cappello Group provides strategic advisory and consulting services to

14   public and private companies.  Cappello Group professionals are "associated persons" under

15   FINRA, and those professionals perform services for clients of Cappello Capital.  The associated

16   persons of Cappello Group are regulated by FINRA.

17   3.    Cappello Group is the management company for Cappello Capital and is

18   responsible for, among many other things, providing Cappello Capital with executive and

19   administrative personnel, office space, and services required in rendering corporate and

20   administrative services.  Cappello Group is also responsible for administering the day-to-day

21   operations of Cappello Capital.

22   4.    Respondent Cary Meadow ("Meadow") is an individual who currently resides in

23   Santa Monica, California.  Cary Meadow worked as a Managing Director for Cappello Group

24   from November 2010 to March 2014.  Meadow was not a licensed representative of the broker-

25   dealer, but was an "associated person" under FINRA rules.  As a Managing Director of Cappello

26   Group, Meadow regularly associated with licensed registered representatives of Cappello Capital,

27   to perform investment banking services on behalf of clients of Cappello Capital.  Meadow

28   performed virtually, if not all, of his services on behalf of clients of Cappello Capital.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1        5.      Respondent Channel Investment Advisors, Inc. ("Channel") is a California

2    corporation with its principal place of business in Santa Monica, California.  Meadow owns

3    and/or controls Channel.  Channel is not a licensed broker-dealer under FINRA regulations.

4        6.      Respondent Paul Kromwyk ("Kromwyk") (CRD # 4221759) resides in Los

5    Angeles, California.  Kromwyk was employed by Claimant from November 2, 2009 until March

6    2014, and was a Registered Representative of Claimant from November 2009 through February

7    2014.  Kromwyk is not currently registered with any securities firm.

8    **JURISDICTION**

9        7.      On March 18, 2015, the Honorable Lisa Hart Cole in the Superior Court for the

10   County of Los Angeles, Case No. SC123140 ruled that "Meadow was an 'associated person'

11   under FINRA, that Cappello Capital was a FINRA member at all relevant times and that Meadow

12   and Channel were agents of one another at all relevant times."

13       8.      In Meadow and Channel's Reply Memorandum of Points and Authorities in

14   support of Defendants' Motion to Compel Arbitration and Stay Action, Meadow and Channel

15   represented to the Superior Court that said defendants "do not and will not contest the arbitrability

16   of this dispute . . . Meadow and Chanel would lose all credibility with the arbitrators and this

17   Court if they were to go to FINRA and then suddenly reverse field and take the contrary position

18   that the dispute is not arbitrable."

19   **FACTUAL BACKGROUND**

20   **General Allegations**

21       9.      Individuals working for Cappello Capital, as well as those working for Cappello

22   Group, jointly service the prospective and existing clients of Cappello Capital.  The associated

23   persons, who are affiliated with Cappello Group, are required to associate with a FINRA-

24   Registered Representative of the broker-dealer, Cappello Capital, when performing any

25   investment banking services for existing or prospective clients of Cappello Capital.

26       10.     Given the close relationship between Cappello Capital and Cappello Group, as

27   well as the integrated nature of the services that professionals at both organizations provide, those

28   individuals working for Cappello Group and Cappello Capital jointly performed services for

Page 2 of 26

1  Cappello Capital's clients, and such activities were regularly reported to FINRA. Those

2  individuals working for either Cappello Capital or Cappello Group, were required at all relevant

3  times to comply with applicable FINRA rules and regulations.

4    11.    Cappello Capital, in cooperation with the professionals at Cappello Group,

5  provided a wide variety of investment banking services to Cappello Capital's clients. Until

6  January 2014, Cappello Capital was a FINRA-registered broker-dealer. Cappello Capital

7  employees were registered with FINRA as Registered Representatives of Cappello Capital. Since

8  January 2014, certain of Cappello Capital's previously-registered representatives have associated

9  with another FINRA-registered broker-dealer.

10    12.    Meadow began providing services for Cappello Capital's clients on or around

11  November 15, 2010. As a non-licensed individual, Meadow was given the title of Managing

12  Director of Cappello Group.

13    13.    As an "associated person," Meadow could service Cappello Capital's clients only

14  by associating with a licensed representative from Cappello Capital. As a consequence of this

15  close relationship between Cappello Capital and Cappello Group, Meadow regularly held himself

16  out as an agent of both Cappello Capital and Cappello Group.

17    14.    Upon Meadow's hiring, Meadow immediately began holding himself out to the

18  public as an agent of both Cappello Capital and Cappello Group. For example, Meadow listed

19  Cappello Capital as his employer on LinkedIn, and he identified Cappello Capital as his employer

20  on his resume. Meadow used Cappello Group's business cards, and he used Cappello Group's

21  name in his e-mail address. Meadow's profile was displayed on Cappello Capital and Cappello

22  Group's joint website. In addition, Meadow used the offices and support staff of both Cappello

23  Group and Cappello Capital to service Cappello Capital's clients. Meadow also used Cappello

24  Capital's marketing materials and contacts to solicit prospective clients and to perform services

25  on behalf of existing Cappello Capital clients. Meadow regularly promoted himself as an agent

26  of both Cappello Capital and Cappello Group throughout his tenure from November 15, 2010

27  until his termination in February, 2014.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 3 of 26

STATEMENT OF CLAIM

Channel Investment Advisors

1

2     15.    Channel purports to be a firm specializing in acquisitions, recapitalizations and

3    growth equity investments in the lower-middle market. Channel was founded in 2003 by

4    Meadow.

5     16.    When Meadow was initially hired by Cappello Group to perform services for

6    Cappello Capital's clients, Meadow failed to fully disclose his outside business activities.

7    Moreover, during his tenure as an agent of Cappello Capital, Meadow continued to hide the

8    extent and nature of the activities engaged in by Channel, his wholly-owned investment banking

9    company.

10     17.    Unbeknownst to Cappello Capital, while Meadow was acting as an associated

11    person with, and agent of, Cappello Capital, Meadow was also actively operating an unlicensed

12    entity, illegally acting as a broker-dealer and secretly diverting Cappello Capital's clients to his

13    unlicensed investment banking entity. Although Channel is not a FINRA member, during

14    Meadow's association with Cappello Capital, Channel secretly and improperly performed

15    investment banking services for clients diverted to it from Cappello Capital.

16     18.    Meadow, through his wholly owned entity Channel, among other things, sought to

17    raise money on behalf of Channel's clients, and Channel also facilitated various investment

18    banking transactions. For example, Channel received compensation from Channel's clients

19    based, at least in part, upon a percentage of the transaction value, rather than in the form of a

20    fixed consulting fee. According to the Securities and Exchange Commission, a person's receipt of

21    transaction-based compensation is a hallmark of broker-dealer activity. Meadow, who is an

22    active member of the State Bar of California, knew that through his activities with Channel, he

23    was improperly engaging in investment banking activities without the required licenses, and

24    without associating with a FINRA Registered Representative.

25     19.    Meadow and Channel attempted to conceal the fact that they were providing

26    unlicensed investment banking services to third parties. For example, on one occasion, Meadow

27    and Channel initially drafted a retention letter for a prospective Channel client describing the

28    services that Meadow and Channel would be providing the client as "investment banking

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1  services." Realizing that Meadow and Channel could not legally provide investment banking

2  services, Meadow subsequently revised the initial engagement letter to mischaracterize the

3  services that Meadow and Channel would be providing as "legal and consulting services."

**Meadow, Channel, and Kromwyk Use Claimant's Resources to**

**Divert Business to Channel**

6       20.     Individuals who are not registered with FINRA are strictly limited in the functions

7  that they can perform while working in the investment banking industry. For example,

8  unregistered persons, such as Meadow, can only contact prospective clients with a registered

9  person to inquire whether such clients wish to discuss investments. Unlicensed persons, such as

10  Meadow, cannot engage in substantive discussions regarding potential business transactions

11  without a registered representative participating.

12       21.     Meadow and Channel, who at all relevant times were not registered or licensed

13  with FINRA, secretly conspired with Kromwyk, among others, who were employees and

14  Registered Representatives of Cappello Capital, to secretly have such licensed individuals

15  participate in Respondents' investment banking activities so that Respondents could purportedly

16  be "associated" with a FINRA-registered broker.

17       22.     Because Channel had no employees other than Meadow, Meadow surreptitiously

18  directed Claimant's employees, junior staff and interns, including Kromwyk – all of whom

19  Claimant was paying – to secretly conduct extensive due diligence, conduct research, and prepare

20  extensive models, materials and analyses on behalf of, and for the benefit of, Channel and

21  Meadow.

22       23.     Meadow also co-opted Claimant's controller to maintain Channel's financial

23  records. Meadow used his authority as a Managing Director to require Claimants' personnel to

24  expend substantial resources on Respondents' outside business activities at Claimant's expense.

25  Claimant was unaware that Meadow was using his executive status to utilize the resources in this

26  undisclosed and unapproved manner. Such efforts facilitated Meadow's ability to attract and then

27  divert Claimant's business opportunities to Respondents for Respondents' own benefit.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 5 of 26

STATEMENT OF CLAIM

24.     Meadow, Kromwyk, and others acting under Meadow's direction, secretly held numerous meetings attended by Claimant's employees and interns in furtherance of Channel's business. Such secret meetings were held to orchestrate the theft of Claimant's business opportunities.

25.     Kromwyk and Meadow, also used Claimant's resources in an unauthorized manner during Claimants' normal business hours to conduct Channel's business. In particular, Kromwyk and Meadow impermissibly used Claimant's computers, phones, printers, and binding equipment to create presentation books for Channel.

**Meadow and Kromwyk Actively Conceal Their Illicit Activity from Claimant And Direct Others To Do The Same, Even When Confronted**

26.     Meadow and Kromwyk, using their actual and/or apparent authority as agents of Cappello Capital, instructed Claimant's employees to conceal from Claimant their conflicting, competitive and/or adverse outside business activities conducted on behalf of Channel. As an agent and associated person of Cappello Capital, Meadow had a duty of full disclosure to Claimant.

27.     Meadow and Kromwyk acted as agents of Cappello Capital, while at the same time surreptitiously operating Channel's competitive business endeavors. Kromwyk and Meadow, in knowing violation of FINRA rules, used both personal and Channel email addresses in an effort to avoid detection by Claimant. Upon information and belief, in order to avoid detection, Meadow and Kromwyk also conducted business via text message, in contravention of FINRA rules, Claimant's internal policies, and specific directions provided to them by Claimant's principals and other managing directors.

28.     Meadow and Kromwyk also attempted to conceal their activities by storing certain documents outside of Claimant's servers in contravention of FINRA rules and Cappello's internal policies. For example, Michael Stone, who was a Cappello Group employee, surreptitiously performed work on behalf of, and for the benefit of Respondents. Respondents secretly maintained dozens of Claimant's confidential investment banking documents and templates

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 6 of 26

STATEMENT OF CLAIM

1   (some containing confidential client information) in a private Dropbox account, for use by

2   Respondents in furtherance of Respondents' conspiracy.

3       29.     Claimant had a practice that on every Monday morning, employees, such as

4   Kromwyk and Stone, were required to complete a staffing form created by Claimant where such

5   employees were required to identify all of the projects that said individuals would be working on

6   during the upcoming week. Meadow and Kromwyk instructed Stone to actively conceal from

7   Claimant the work that Stone and others were performing for Meadow, Kromwyk and Channel,

8   by instructing Stone not to report such work on the weekly forms that Stone was required to

9   complete. Similarly, Kromwyk failed, in his own reporting, to accurately represent the work he

10  was doing on behalf of Meadow and Channel.

11      30.     In addition, every other Monday, all professionals and interns of both Cappello

12  Capital and Cappello Group would convene for a lunch meeting to discuss the ongoing and

13  prospective deals that such individuals were working on, on behalf of Claimant. On the

14  alternating Mondays, the Managing Directors (such as Meadow) and Senior Vice Presidents (such

15  as Kromwyk) of both entities, would hold similar meetings. Meadow and Kromwyk, among

16  others, actively concealed at these meetings the deals that they were working on, on behalf of

17  Claimant's competitor, Channel. Meanwhile, Meadow, Kromwyk and others, as trusted agents of

18  Claimant, were privy to and entrusted with Claimant's confidential list of engaged clients and

19  prospects, and said individuals had full knowledge of the opportunities that they were diverting

20  from Claimant to Respondents, in breach of their respective fiduciary obligations to their

21  principal, Cappello Capital.

                            **February 2014 OBA Forms**

23      31.     In February 2014, Claimant required all individuals working for Claimant and

24  Cappello Group, including Meadow, Kromwyk and Stone, to provide updated OBA forms.

25  Kromwyk intentionally and actively concealed all of his outside business activities, and Stone

26  only disclosed a non-investment related (bicycle business) outside business activity. Kromwyk

27  and Stone intentionally concealed the existence and nature of their respective outside business

28  activities on behalf of Respondents.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 7 of 26

STATEMENT OF CLAIM

32.     On February 11, 2014, Meadow completed an OBA Report that contained false and misleading information.  For example, Meadow failed to disclose that as recently as November 25, 2013, Meadow had entered into a written agreement for Channel to provide investment banking services to a prospective Cappello Capital client, WorldLink Ventures, Inc. ("WorldLink").  Meadow also failed to disclose in his OBA Report that he and/or Channel was engaging in outside business activities with, among other entities, Arctic Glacier and Patriot Environmental Services, Inc. ("Patriot").   Meadow also failed to disclose in his OBA Report Respondents' actual business and/or financial relationship to any number of Claimant's current and prospective clients and the nature of such relationships.  Moreover, when expressly asked in his OBA Report to identify any client of Claimant that was affiliated with Meadow's outside business activities, Meadow only identified "TTSI PRS."  Meadow failed to identify the many other of Claimant's clients or prospects of Claimant, for whom he and Respondents were performing services.  The OBA Report completed by Meadow was materially false and misleading, and was completed with the intent to, and did, defraud Claimant.

**Claimant Discovers The Wrongful Conduct**

33.     In early January 2014, Rob Deutschman, the Vice Chairman of Cappello Group, confronted Stone to discuss Deutschman's suspicions that Stone was performing competitive outside work for Meadow, that was not being reported on Stone's weekly disclosure forms.  Upon being confronted, Stone misleadingly disclosed that he had worked on just one project for PRS.  Stone only revealed to Deutschman that he had done "some" background work for a prospective deal for PRS that was never consummated, but that had nonetheless resulted in Meadow joining the board of PRS.

34.     Stone actively concealed from Deutschman the fact that Stone had extensively worked on the PRS deal on behalf of Channel for nearly one year, and that Channel, a competitor of Claimant, had been providing unlicensed investment banking services to PRS.  Stone also actively concealed from Deutschman that he had been performing work for Respondents on behalf of, inter alia, Patriot, WorldLink and other clients of Channel.  When given the opportunity to reveal the nature and extent of his outside business activities, Stone made the conscious

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1   decision to continue to actively conceal his unauthorized outside business activities. Only in

2   March 2014, when Stone was confronted with the results of Claimant's initial investigation as to

3   his activities, and those of Respondents, did Stone fully admit the extent of his involvement.

4          35.    On February 7, 2014, Claimant held a firm retreat in Malibu, California, at which

5   senior executives were in attendance. As a senior executive, Meadow attended the retreat. At

6   this firm retreat, Deutschman confronted Meadow concerning rumors heard by Deutschman that

7   Meadow had been engaging in outside business activities. Deutschman also raised Claimant's

8   suspicions that Meadow was working on outside business activities using Claimant's resources,

9   including Claimant's personnel. Meadow flatly denied these allegations and also denied that he

10   was acting in any way other than in pursuing Claimant's best interests. Meadow claimed that he

11   was simply trying to generate additional business for Claimant.

12          36.    Shortly following the firm retreat, Cappello Capital CEO, Alexander Cappello,

13   unaware of Kromwyk's own illicit activities, asked Kromwyk to inquire of Stone about Stone's

14   rumored involvement in these same outside business activities, including with respect to a deal

15   involving Claimant's prospective client, Patriot. Kromwyk pleaded ignorance to having any

16   knowledge of Stone or Meadow performing any outside activities on behalf of Patriot. In

17   response to Alex and/or Cappello's request of Kromwyk to investigate such suspicions, Kromwyk

18   represented that he would "look into it."

19          37.    Remaining highly suspicious, in February 2014, Claimant conducted an internal

20   investigation, and reviewed the computer files of Meadow, Kromwyk, Stone and others. The

21   investigation revealed that Respondents used Claimant's unlicensed personnel, licensed

22   personnel, platform, resources and reputation to source personal opportunities and to secretly

23   divert Claimant's prospective and engaged clients to Channel. These prospects and engaged

24   clients included, but are not limited to, Arctic Glacier ("Arctic Glacier"); Comet Electric, Inc.

25   ("Comet"); Cranes, Inc. ("Cranes"); Patriot; Pavement Recycling Services, Inc. ("PRS"); and

26   WorldLink.

27          38.    Upon confirming these illicit activities, Claimant terminated Meadow, Kromwyk

28   and Stone in March 2014.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

WorldLink

39.     On March 20, 2013 at 4:29pm, David Stern, a partner at the law firm of Jeffer, Mangels, Butler and Mitchell, LLP ("Jeffer"), who was a former law school classmate of Cappello Managing Director, Rob Deutschman, sent an email addressed jointly to both Cary Meadow and Rob Deutschman referring WorldLink as a potential client to Claimant. David Stern asked for materials demonstrating Cappello Capital's expertise and experience "representing a potential seller of a mid-market advertising company." Eight minutes later, Meadow responded to David Stern, with a carbon copy to Rob Deutschman, that Meadow would forward to Stern the materials relating to Cappello Capital's expertise and experience in this area. On May 21, 2013, after David Stern was hired as counsel to WorldLink, Cappello Capital hand delivered the requested marketing information to Stern. After the referral of WorldLink by Stern to Cappello Capital, WorldLink regularly appeared on Cappello Capital's weekly internal deal prospect list.

40.     A Cappello Capital team, led by Meadow, made a presentation to WorldLink and held several meetings with WorldLink. Cappello Capital presented the economic terms of its proposed engagement agreement to David Stern, counsel for WorldLink. Meadow was the point person who was directly involved in the creation, and had full knowledge of Cappello Capital's proposed economic terms of the engagement agreement that was communicated by Cappello Capital to Stern, counsel for WorldLink. Notwithstanding months of negotiation by Meadow on behalf of Cappello Capital with WorldLink's counsel, David Stern, who Cappello Capital subsequently discovered was simultaneously acting as Respondents' counsel (as well as WorldLink's), no engagement agreement was ever entered into between Cappello Capital and WorldLink.

41.     Meadow represented to Cappello Capital, and continued to assert up until the time of his termination in March 2014, that he was acting in his capacity as a Managing Director of Cappello Group, working on behalf of Cappello Capital's prospective client, WorldLink. Meadow represented to Cappello Capital that he was endeavoring to obtain WorldLink's retention of Cappello Capital as its investment banker.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

42.   In contravention of Meadow's express representations, Cappello discovered after
Meadow's termination, that on November 25, 2013, Meadow, while negotiating an engagement
agreement on behalf of Cappello Capital, simultaneously secretly forwarded to WorldLink and its
counsel, David Stern, a draft engagement agreement on behalf of Channel.  The engagement letter
sent by Meadow stated that Channel -- not Cappello Capital -- would provide investment banking
services to WorldLink in exchange for a fee to be paid to Channel.  Stern and Meadow, as active
members of the State Bar, knew that Channel did not have the requisite licenses to provide
investment banking services to WorldLink.  Using Claimant's confidential information,
Meadow's offer to provide investment banking services to WorldLink was for a lower fee than
the fee that Meadow had offered to WorldLink on behalf of Cappello Capital.

43.   Meadow, as a fiduciary of Cappello, was entrusted with the responsibility of
negotiating with WorldLink the investment banking fee and other economic terms on behalf of
Cappello.  However, Meadow used this confidential information to undercut Cappello's offer, and
secretly secure the engagement for himself.

44.   Channel and WorldLink entered into a secret investment banking services
agreement, dated as of November 25, 2013.  Respondents agreed to provide investment banking
services to WorldLink for a $25,000 fee -- exactly half of the fee that Cappello had offered.  The
November 25, 2013 WorldLink/Channel engagement agreement further specifically contemplated
the provision of investment banking services by Meadow and Channel to WorldLink for future
capital raising and mergers and acquisitions.  Such services could have been, and should have
been provided by Cappello Capital to WorldLink.  The services that Channel and Meadow
secretly agreed to provide WorldLink were traditional investment banking services, that, as a
lawyer, Meadow knew that only a licensed individual could lawfully provide to a third party.

45.   Stern, on behalf of Jeffer, facilitated the unlawful activity, knowing that both of his
clients would benefit from the November 25, 2013 engagement.  Stern's client WorldLink would
benefit from a reduced investment banking fee, and Stern's client Channel, would be hired to
assist in the transaction.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 11 of 26

STATEMENT OF CLAIM

46.     WorldLink was concerned that Cappello might discover the secret and unlawful investment banking services agreement entered into by Channel and WorldLink. Thus, the Channel/WorldLink investment banking services agreement tellingly contained an indemnity provision, providing that Meadow and Channel would indemnify WorldLink "against any and all claims or liabilities of any kind or nature that may be asserted by Cappello Capital or its affiliates arising out of the services furnished by Channel hereunder."

47.     Neither the Channel/WorldLink engagement agreement, nor Meadow's relationship with WorldLink, was ever disclosed to Claimant.

**Sandpiper Capital Management**

48.     In early 2012, Channel, through Meadow, entered into an investment banking services agreement with Sandpiper Capital Management, LLC in an attempt to acquire Claimant's prospective client, Cranes. Channel's investment banking services agreement with Sandpiper Capital Management acknowledged that a broker-dealer license might be required to perform the services contemplated by the agreement. The agreement further provided that a principal of Sandpiper would seek to reactivate said individual's dormant securities license.

49.     Only once that individual at Sandpiper failed to reactivate his dormant securities license, did Meadow, who was holding himself out as an agent of Cappello Capital, subsequently encourage Cranes to execute a secret engagement "agreement" under Cappello Capital's name. Meadow never informed Cappello Capital of the existence of the secret engagement agreement to provide investment banking services to Cranes, and such agreement was not in conformity with Claimant's approved form of engagement agreement. Meadow, as an agent and associated person of Cappello Capital, with the assistance of Kromwyk, without informing anyone else at Claimant, secretly entered into this fraudulent "agreement" under Claimant's name, in clear and knowing violation of FINRA rules and Claimant's internal policies.

50.     Claimant is required to maintain records of any and all engaged and prospective clients. By not disclosing the existence of the Cranes engagement to Claimant, it created a potential violation of FINRA rules. To conceal this fraudulent "agreement" from Claimant, and to enable Meadow to secretly divert the business opportunity and any fees resulting thereunder

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1   from Claimant to himself, Meadow fraudulently altered the terms of Claimant's standard

2   engagement letter in many ways, including, but not limited to, providing that all notices under the

3   agreement be directed solely to Meadow, despite the fact that the "agreement" was being entered

4   into between Cranes and Cappello Capital. This provision enabled Meadow and Kromwyk to

5   conceal their fraudulent scheme from Cappello Capital by excluding other Claimant's employees

6   and agents from learning about the secret agreement with Cranes.

7        51.    Consequently, Cappello did not become aware of this fraudulent "engagement"

8   that Meadow caused to be entered into while acting as an agent and associated person of

9   Claimant. Accordingly, the Cranes transaction did not appear on Claimant's internal log of

10   prospective or existing deals, and was not reported to FINRA, until Claimant later discovered it.

11   In addition, as Claimant learned in the course of its 2014 internal investigation, in the course of

12   pursuing a potential transaction with Cranes, Meadow actually entered into contractual

13   arrangements with third party service providers (e.g. an appraisal company) under the name of

14   Claimant, without Claimant's knowledge or consent, to assist him in his fraudulent efforts.

15        52.    Once Claimant discovered the existence of the fraudulent engagement letter

16   between "Claimant" and Cranes, and his activities pursuant thereto, Claimant confronted

17   Meadow. Meadow admitted his conduct, but claimed that he had "planned" to disclose the

18   existence of such agreement to Claimant if, and when, a deal was consummated.

19                   **Patriot Environmental Services**

20        53.    In early 2013, Meadow, while acting as an agent and associated person of

21   Cappello Capital, originated a relationship on behalf of Cappello Capital with an entity known as

22   Patriot Environmental Services. Cappello Capital was to be retained to sponsor a transaction to

23   raise money for the acquisition of Patriot.

24        54.    Unbeknownst to Cappello Capital, Meadow entered into a written non-disclosure

25   agreement on behalf of Claimant with Patriot, which was initially sent to Patriot on Claimant's

26   letterhead. To divert the client to Channel, Meadow subsequently revised Claimant's non-

27   disclosure agreement, to remove any reference to Claimant, and instead secretly inserted

28   Channel's name in lieu of Claimant's.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

55.     Meadow, acting as an agent and associated person on behalf of Cappello Capital, initially corresponded with Patriot using his Cappello email address. However, to conceal their wrongful conduct and their participation in the Patriot transaction, and in knowing violation of FINRA rules and Cappello's internal procedures, Meadow, Kromwyk and Stone subsequently began forwarding emails regarding the Patriot transaction on newly and secretly-created Channel email addresses. Meadow, Kromwyk and Stone also began storing such Channel emails and documents relating to the Patriot transaction on servers maintained outside of Cappello's control.

56.     At Meadow and Kromwyk's direction, commencing in the spring of 2013, Stone, while working for and/or on behalf of Cappello, and while being compensated by Cappello, provided substantial advisory and investment banking services to Patriot on behalf of Meadow, Kromwyk and/or Channel. Kromwyk and Stone created multiple financial models and investor presentations with respect to Patriot while working for Claimant. The investors and lenders who participated in the Patriot transaction were also initially introduced to Meadow through Cappello Capital, or solicited by Meadow through Cappello's relationships. To solicit lenders and investors for Patriot, Meadow at various times corresponded with said investors and lenders by using his Cappello email address, thereby holding himself out to Patriot and others as an agent of Claimant.

57.     In February 2014, Channel consummated a transaction involving the acquisition of Patriot, in which Cappello did not participate or receive any fee or any other compensation. Substantial cash fees and equity interests in Patriot were diverted by Meadow from Claimant to Meadow and/or Channel upon the closing of the Patriot transaction. Kromwyk and Stone each subsequently became employees of Patriot. Kromwyk assumed the position of Chief Financial Officer of Patriot upon the closing of the transaction.

**Respondents' Diversion of Wellspring Capital Management's Business from Claimant**

58.     On October 1, 2011, while an agent and associated person of Claimant, Meadow secretly entered into a written consulting agreement to source deal opportunities for Wellspring Capital Management, LLC. On October 4, 2011, Channel entered into a nearly identical agreement with Wellspring Capital Partners V, L.P. (collectively, with Wellspring Capital

1    Management, LLC, "Wellspring"). Notably, these agreements between Channel and Meadow, on

2    the one hand, and Wellspring, on the other, provided for certain compensation to be paid to

3    Channel and Meadow in the form of a "success fee." The "success fee" is a fee typically paid in

4    connection with the provision of investment banking services. Therefore, for Channel and/or

5    Meadow to legally receive such a fee, Channel and Meadow would have been required to secure

6    an association with a registered broker-dealer.

7        59.    Meadow had previously verbally informed Claimant that he had been tasked with

8    sourcing opportunities for Wellspring, which, if successful, would result in Claimant receiving a

9    share of the fees. Nevertheless, Meadow actively concealed from Claimant the existence and

10   elements of any formal agreement between Channel/Meadow and Wellspring.

11       60.    Despite the fact that it was Claimant's employees who were performing the due

12   diligence on potential Wellspring deals, Meadow secretly diverted from Claimant a $25,000

13   monthly fee which was paid directly by Wellspring to Channel with respect to such services.

14   Channel/Meadow's secret agreements with Wellspring provided that Channel/Meadow, and not

15   Claimant, would receive a fee for deals that Channel presented to Wellspring. In fact, Meadow

16   and Channel secretly used Claimant's resources to meet their obligations under the Wellspring

17   agreements, by sourcing, exploring and presenting various opportunities that Claimant's

18   personnel had originated and/or diligenced.

19       61.    The deals that Meadow and Channel secretly presented to Wellspring, included,

20   but are not limited to, a potential transaction with Arctic Glacier, which had been originated by

21   another of Cappello Capital's Managing Directors. To perform services for Wellspring, Meadow,

22   who was an agent and an associated person of Cappello Capital, and Kromwyk, who was

23   employed by Cappello Capital, secretly instructed Stone and others to conduct extensive due

24   diligence and prepare PowerPoint presentations and financial materials in connection with deals

25   that Meadow and Kromwyk presented to Wellspring. Meadow and Kromwyk attempted to hide

26   their wrongful conduct by presenting certain deals to Wellspring that did not appear on

27   Cappello's internal weekly logs of active prospects and deals.

28

STATEMENT OF CLAIM

## Pavement Recycling Systems

62. An entity known as Pavement Recycling Systems ("PRS") was initially approached by Meadow in his capacity as an agent and associated person of Cappello Capital for the purpose of soliciting PRS as a potential investment banking client of Cappello Capital. At various times, Meadow informed Claimant that Meadow was discussing an opportunity for a sale of PRS, for which Cappello Capital would be retained as the "sell side" advisor.

63. Claimant subsequently learned that, in fact, in July 2013, Channel had secretly, and to the exclusion of Claimant, sought to raise money for an acquisition of PRS. Claimant also discovered that Channel had intended to use the fee that Channel received from the transaction, to allow Channel itself, along with others, to acquire PRS. As an active member of the California State Bar, Meadow well knew that Channel was not permitted to raise money for PRS because Channel was not licensed by FINRA.

64. Kromwyk and Meadow, and at their direction, Michael Stone, all expended substantial resources and effort to perform extensive due diligence and create numerous models and materials on behalf of Channel, to provide to potential investors in the Channel/PRS deal, none of which was ever disclosed to Claimant. Neither Meadow nor Stone listed PRS as a prospect on Cappello's weekly logs of engaged and prospective clients. While the PRS deal did not close, Meadow nevertheless joined the Board of Directors of PRS in 2013. Meadow and Kromwyk actively concealed from Claimant Meadow's appointment to the PRS Board of Directors until January, 2014.

## InterMedia Partners

65. In 2011, Meadow holding himself out as an agent and associated person of Cappello Capital by, among other things, using his Cappello email address, facilitated an introduction between The Brener Group and InterMedia Partners. Acting as an agent and an associated person of Cappello Capital, Meadow proposed to InterMedia that InterMedia contribute certain of its assets into a company to be funded by Azteca Acquisition Corporation. Meadow secretly diverted this business opportunity away from Cappello Capital to Channel.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 16 of 26

STATEMENT OF CLAIM

66.     The Brener Group and InterMedia, among others, ultimately entered into an
approximately $400 million transaction.  Subsequently, a dispute arose in 2013 regarding
Meadow's claim for compensation for the services that Meadow claimed that Channel and/or
Meadow had provided in connection with the transaction.  This dispute resulted in a secret
settlement payment to Meadow and/or Channel.  All of such settlement proceeds were secretly
received by Meadow, without the knowledge or consent of Claimant.

67.     In addition, it was subsequently discovered that Meadow and Channel had agreed,
without either the knowledge or approval of Cappello Capital, through its counsel, David Stern of
Jeffer, to a release of any potential claims that the Cappello Capital might have against the parties
to the transaction.  Cappello Capital was never aware nor did it consent to this purported release
that Respondents had entered into on behalf of Cappello Capital.  In fact, Cappello Capital only
learned of this purported release in connection with its investigation into Meadow's outside
business activities in early 2014. Cappello Capital did not receive any portion of the settlement
payment, nor did it receive any consideration for the purported release entered into on its behalf
by Respondents and Jeffer.

## FIRST CAUSE OF ACTION

### Violation of California Penal Code § 502

### (Against All Respondents)

68.     Claimant incorporates herein by reference each of the allegations set forth above
as though fully set forth herein.

69.     On a repeated and systematic basis, Meadow, Kromwyk and Channel, either
individually or as part of a conspiracy, have knowingly used, or caused to be used, Claimant's
computer services without permission, in violation of California Penal Code § 502(c)(3).

70.     Meadow, Kromwyk and Channel, either individually or in conspiracy with others,
have, without permission, have knowingly used Claimant's data, computers, computer system,
and/or computer network to divert Claimant's engaged and/or prospective clients to Channel, in
violation of California Penal Code § 502(c)(1).

MANATT, PHELPS &
PHILLIPS, LLP.
ATTORNEYS AT LAW
LOS ANGELES

Page 17 of 26

STATEMENT OF CLAIM

71.     Furthermore, Meadow, Kromwyk, and Channel, either individually or in conspiracy with others, have repeatedly and systematically, without permission, taken, copied or made use of Claimant's data from Claimant's computer, computer system or computer network to divert Claimant's engaged and prospective clients to Channel, as well as Claimant's confidential information, in violation of California Penal Code § 502(c)(2).

72.     As alleged in more detail hereinabove, these violations have caused damage to Claimant, including loss of fees to which they would have been otherwise entitled.

73.     All Respondents have acted with oppression, fraud or malice toward Claimant, entitling Claimant to an award of punitive damages in an amount sufficient to deter them from future misconduct.

74.     Pursuant to California Penal Code § 502(e), Claimant is entitled to compensatory and punitive damages, attorneys' fees, and other legal and equitable relief as prayed for herein.

75.     WHEREFORE, Claimant prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Meadow and Kromwyk)

76.     Claimant incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

77.     As an agent and associated person of principal Cappello Capital, Kromwyk and Meadow were in fiduciary relationships to Cappello Capital. As a fiduciary, Meadow and Kromwyk were each required to keep Cappello Capital fully and completely informed of all material facts and circumstances of the transactions with which Kromwyk and Meadow were involved.

78.     By engaging in the acts alleged herein, Meadow and Kromwyk breached their fiduciary obligations to their principal Cappello Capital. As an agent of Claimant, Meadow and Kromwyk were each under a legal duty to account for all profits made, and therefore Meadow and Kromwyk hold such money as constructive trustees.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 18 of 26

STATEMENT OF CLAIM

1    79.    As a result of Meadow and Kromwyk's breach of their respective fiduciary duties,

2  Claimant has suffered and continues to suffer economic loss, and other general and specific

3  damages including, but not limited to, lost profits, lost revenue, lost business opportunities, and

4  lost productivity, among other damages, and in an amount to be determined according to proof at

5  the time of trial.

6    80.    Meadow and Kromwyk's wrongful acts were committed maliciously,

7  oppressively, and with an intent to defraud, and Claimant is entitled to punitive and exemplary

8  damages in an amount to be ascertained according to proof at the time of trial, which is

9  appropriate to punish and set an example.

10    81.    WHEREFORE, Claimant prays for relief as set forth below.

11                           **THIRD CAUSE OF ACTION**

12              **Misappropriation of Confidential Information**

13                       **(Against All Respondents)**

14    82.    Claimant incorporates herein by reference each of the allegations set forth above

15  as though fully set forth herein.

16    83.    Claimant acquires, develops, maintains and retains confidential information which

17  includes, but is not limited to, its list of engaged and prospective clients, data about its

18  prospective and existing clients, client work product, and the content of work for clients.  Such

19  information is confidential, but is not a trade secret.

20    84.    Maintaining the secrecy of this confidential information is critical to the success of

21  Claimant's investment banking and consulting business. The information is protectable, is not

22  generally known to the public or to Claimant's competitors, and is subject to reasonable efforts by

23  Claimant to maintain its secrecy.

24    85.    Meadow and Kromwyk were entrusted with access to Claimant's confidential

25  information about, among other things, Cappello's clients and prospective clients. Meadow

26  conspired with Channel and Kromwyk and others to misappropriate Claimant's confidential

27  information by using the information to divert business to Channel without Claimant's express or

28  implied consent and in violation of the law and Claimant's policies.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 19 of 26

STATEMENT OF CLAIM

86.     As a result of Respondents' conspiracy to engage in such wrongful conduct, Claimant has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, lost profits, lost revenue, lost business opportunities, and lost productivity, among other damages, all in an amount to be determined according to proof at the time of trial.

87.     Respondents' wrongful acts were committed maliciously, oppressively, and with intent to defraud, and Claimant is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of the arbitration, which is appropriate to punish and set an example.

88.     WHEREFORE, Claimant prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Conversion

### (Against All Respondents)

89.     Claimant incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

90.     Claimant possessed confidential information, which includes, but is not limited to, its list of engaged and prospective clients, data about clients, client work product and the content of work for its prospective and existing clients. Meadow and Kromwyk were entrusted with this information while working for Claimant.

91.     Respondents conspired to wrongfully convert Claimant's confidential information and used it to secretly divert Claimant's engaged and prospective clients to Channel.

92.     As a result of Respondents' wrongful conduct, Claimant has suffered, and continues to suffer, economic loss and other general and specific damages, including, but not limited to, lost profits, lost revenue, lost business opportunities and lost productivity, among other damages, all in an amount to be determined according to proof at the time of trial.

93.     Respondents' wrongful acts were committed maliciously, oppressively, and with intent to defraud, and Claimant is entitled to punitive and exemplary damages in an amount to be

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 20 of 26

STATEMENT OF CLAIM

1    ascertained according to proof at the time of the arbitration, which is appropriate to punish and set

2    an example.

3          94.    WHEREFORE, Claimant prays for relief as set forth below.

4                          ## FIFTH CAUSE OF ACTION

5                                   ### Fraud

6                          **(Against All Respondents)**

7          95.    Claimant incorporates herein by reference each of the allegations set forth above

8    as though fully set forth herein.

9          96.    As an agent of Claimant, Meadow and Kromwyk were aware of their respective

10   obligations to fully and honestly disclose their outside business activities to Claimant—upon hire,

11   on an annual basis and with any change in circumstances—through receipt of Claimant's policies

12   and through attendance at annual compliance and other meetings. Meadow and Kromwyk were

13   also aware that they could not divert business away from Claimant for their own personal benefit.

14         97.    Meadow and Kromwyk nonetheless intentionally concealed their outside business

15   activities involving Channel, including Respondents' affiliation with Claimant's engaged and/or

16   prospective clients, from Claimant, and instructed other of Claimant's employees and interns

17   acting at Meadow and Kromwyk's direction to do the same.  Meadow and Kromwyk actively hid

18   their outside business activities from Claimant, including, but not limited to, by intentionally

19   failing to disclose them on Claimant's outside business activity form and by failing to disclose

20   them during Claimant's Monday management meetings. Critically, Meadow and Kromwyk

21   actively concealed their outside business activities from Claimant, even when confronted.

22         98.    Meadow and Kromwyk knew their actions to be fraudulent and went to great

23   lengths to conceal their actions from Claimant with the intent to defraud and deceive Claimant.

24         99.    Claimant was ignorant of the actions being undertaken by Respondents. Claimant

25   believed that Meadow and Kromwyk were acting in the best interests of Claimant and relied upon

26   representations made by Meadow and Kromwyk, that they were not participating in any

27   undisclosed outside business activities.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 21 of 26

STATEMENT OF CLAIM

100. As a result of Respondents' wrongful conduct, Claimant has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, lost profits, lost revenue, lost business opportunities, lost productivity, and loss of workforce, among other damages, all in an amount to be determined according to proof at the time of this arbitration.

101. Respondents committed the wrongful acts maliciously, oppressively, and with intent to defraud and permanently deprive Claimant of its property and employees. Claimant is entitled to punitive and exemplary damages in an amount to be ascertained according to proof at the time of the arbitration, which is appropriate to punish and set an example.

102. WHEREFORE, Claimant prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (Against All Respondents)

103. Claimant incorporates herein by reference each of the allegations set forth above as though fully set forth herein.

104. Claimant's potential and engaged clients were in an economic relationship with Claimant that benefitted Claimant economically, and likely would have continued to benefit Claimant in the future.

105. By virtue of their former positions and duties as agents for Claimant, Meadow and Kromwyk were aware of the relationships that Claimant enjoyed with Claimant's engaged and prospective clients.

106. By virtue of Channel being a "competitor" of Claimant, and through Channel's receipt of information from its conspiracy with Meadow and Kromwyk and others, Channel was also aware of such relationships between Claimant and its engaged and prospective clients.

107. Claimant is informed and believes that all Respondents intended to, and did, disrupt Claimant's business operations and relationships with its clients and prospective clients by, among other things, directly or indirectly soliciting Claimant's clients to divert their business from Claimant, and instead send such business opportunities to Channel through wrongful

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1   conduct including, but not limited to, improper solicitation of Claimant's clients, fraud,

2   conversion, and misappropriation of confidential information from Claimant by Respondents.

3        108.   As a result of all Respondents' wrongful conduct, Claimant has suffered and

4   continues to suffer economic loss, and other general and specific damages, including, but not

5   limited to, lost profits, lost revenue, lost business opportunities, and loss of workforce, among

6   other damages, all in an amount to be determined according to proof at the time of the arbitration.

7        109.   Respondents committed the wrongful acts maliciously, oppressively, and with

8   intent to defraud and permanently deprive Claimant of their property, economic benefits and

9   employees. Claimant is entitled to punitive and exemplary damages in an amount to be

10   ascertained according to proof at the time of the arbitration, which is appropriate to punish and set

11   an example.

12        110.   WHEREFORE, Claimant prays for relief as set forth below.

13                     **SEVENTH CAUSE OF ACTION**

14               **Intentional Interference with Contract**

15                  **(Against All Respondents)**

16        111.   Claimant incorporates herein by reference each of the allegations set forth above

17   as though fully set forth herein.

18        112.   Claimant and its clients and prospective clients had entered into agreements that

19   benefitted Claimant economically, and likely would have continued to benefit Claimant in the

20   future.

21        113.   By virtue of their former positions as agents of Claimant, Meadow and Kromwyk

22   were aware of these contracts, with clients and prospective clients of Claimant.

23        114.   By virtue of Channel being a "competitor" of Claimant, and through Channel's

24   receipt of information from its conspiracy with Meadow, Kromwyk, and others, Channel was also

25   aware of these contracts.

26        115.   Claimant is informed and believes that Respondents intended to, and did, disrupt

27   Claimant's contracts with Claimant's clients and prospective clients by, among other things,

28   directly or indirectly soliciting Claimant's clients and prospective clients to breach their contracts

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1   and divert their business from Claimant, and instead send their business opportunities to Channel

2   through wrongful conduct including, but not limited to, improper solicitation of Claimant's

3   clients, fraud, conversion, and misappropriation of confidential and proprietary information from

4   Claimant by Respondents.

5        116.   Respondents also interfered with Claimant's employment agreements with

6   Kromwyk and Stone, and other individuals employed by Claimant, by directing Claimant's

7   employees to devote their time to Respondents' outside business activities at Claimant's expense.

8   Respondents also directed Stone to misappropriate Claimant's confidential information, in

9   violation of Stone's employment agreement with Claimant.

10       117.   As a result of all Respondents' wrongful conduct, Claimant has suffered and

11  continues to suffer economic loss, and other general and specific damages, including, but not

12  limited to, lost profits, lost revenue, lost business opportunities, and loss of workforce, among

13  other damages, all in an amount to be determined according to proof at the time of the arbitration.

14       118.   Respondents committed the wrongful acts maliciously, oppressively, and with

15  intent to defraud and permanently deprive Claimant of their property, economic benefits and its

16  employees. Claimant is entitled to punitive and exemplary damages in an amount to be

17  ascertained according to proof at the time of the arbitration, which is appropriate to punish and set

18  an example.

19       119.   WHEREFORE, Claimant prays for relief as set forth below.

20                       **EIGHTH CAUSE OF ACTION**

21                          **Constructive Trust**

22                       **(Against All Respondents)**

23       120.   Claimant incorporates herein by reference each of the allegations set forth above

24  as though fully set forth herein.

25       121.   As alleged herein, Respondents, through their fraudulent and wrongful conduct,

26  diverted fees and other revenue from Claimant to Respondents.

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

STATEMENT OF CLAIM

1      122.    Claimant is informed and believes, and on that basis alleges, that Respondents

2    presently hold and retain these amounts that they wrongfully acquired from Claimant.  An agent

3    is under a legal duty under California law to account for all profits made.

4      123.    Respondents would be improperly enriched if allowed to retain these amounts,

5    which rightfully belong to Claimant.  These amounts should therefore be equitably held in trust

6    for the benefit of Claimant.

7      124.    Respondents would not have received the unlawful benefits but for their wrongful

8    conduct.  An agent holds any money received as a constructive trustee for the principal.

9      125.    Claimant was injured as a proximate result of Respondents' unlawful conduct.

10      126.    Accordingly, Claimant is entitled to, among other things, restitution and

11    disgorgement of profits from Respondents, jointly and severally, in addition to all monetary

12    damages due, in an amount to be determined according to proof at the arbitration.

13      127.    Claimant has no adequate remedy at law for the injuries alleged herein.  Claimant

14    is informed and believes, and thereon alleges, that the Respondents have attempted to hide and

15    shield the amounts that they wrongfully acquired from Claimant in order to preclude Claimant

16    from recovering the money that is rightfully theirs.  Claimant therefore seeks a constructive trust

17    upon all amounts that the Respondents wrongfully acquired from Claimant and that such amounts

18    be transferred to Claimant.

19      128.    WHEREFORE, Claimant prays for relief as set forth below.

20                   **NINTH CAUSE OF ACTION**

21                      Accounting

22                 (Against All Respondents)

23      129.    Claimant incorporates herein by reference each of the allegations set forth above

24    as though fully set forth herein.

25      130.    Meadow and Kromwyk are under a duty as agents of Claimant, to account for all

26    profits made.  Any monies received by Meadow and Kromwyk as agents for Claimant, shall be

27    held in constructive trust by Meadow and Kromwyk.

28

1    131.    Claimant is informed and believes, and thereon alleges, that Respondents

2    siphoned, diverted and wrongfully acquired fees paid by third parties for their own benefit.

3    132.    Claimant is therefore entitled and demand an accounting of all amounts wrongfully

4    siphoned, diverted or acquired by them through any means.  Claimant cannot ascertain the

5    amounts converted by the Respondents without a full accounting of all transactions and contracts

6    entered into by or between Respondents and various known and presently unknown third parties.

7    133.    WHEREFORE, Claimant prays for relief as set forth below.

8    ## PRAYER FOR RELIEF

9    WHEREFORE, Claimant prays for relief as follows:

10   134.    For compensatory and general damages according to proof;

11   135.    For special damages according to proof;

12   136.    For consequential damages according to proof;

13   137.    For prejudgment interest at the maximum legal rate;

14   138.    For punitive and exemplary damages according to proof;

15   139.    For restitution;

16   140.    For costs of the proceedings herein;

17   141.    For an accounting;

18   142.    For attorneys' fees *inter alia*, pursuant to Penal Code Section 502;

19   143.    For disciplinary action that the Arbitrators deem just and appropriate; and

20   144.    For such other and further relief as the Arbitrators deem just and proper.

22   Dated:  April __17__, 2015          MANATT, PHELPS & PHILLIPS, LLP

24   By: _Nt H. Platt_____

25          Robert H. Platt
            *Attorneys for Claimant*
            CAPPELLO CAPITAL CORP.

314389060.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

Page 26 of 26

STATEMENT OF CLAIM