UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ALL AMERICAN OIL & GAS, INCORPORATED, *et al.*[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 18-52693-rbk <br><br> Jointly Administered Under <br> Case No. 18-52693-rbk |

## CAMDEN FINANCIAL SERVICES' MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES TO PROOFS OF CLAIM

TO THE CHIEF U.S. BANKRUPTCY JUDGE RONALD B. KING:

Creditor Camden Financial Services ("Camden"), in its capacity as the assignee of Niagara International Capital Limited ("Niagara"), files this Motion for Summary Judgment on Affirmative Defenses to Proofs of Claim (the "Motion") and in support thereof, Camden respectfully states as follows:

## PRELIMINARY STATEMENT

1. Pending in this matter is the Motion to Estimate Camden's Proofs of Claim (the "Estimation Motion") against AAOG (Claim No. 16) and KRH (Claim No. 17) (collectively, the "Camden Claims"). In the Estimation Motion, the Debtors assert various defenses to the Camden Claims as support for their argument for estimation. Because each of the asserted defenses fail as a matter of law, Camden requests that the Court summarily deny each of them and estimate the Camden claims in the full amount as filed.

2. The Camden Claims arise out of, and seek to redress, AAOG's and KRH's (collectively, the "Debtors") failure and refusal to honor their express contractual obligations

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number are: as follows: All American Oil & Gas Incorporated (5894) ("AAOG"); Kern River Holdings Inc. (0508) ("KRH"); and Western Power & Steam, Inc. (2088) ("WPS"). The Debtors' service address is 9601 McAllister Freeway, Suite 221, San Antonio, Texas 78216.

under their respective written agreements with Niagara and Global, pursuant to which they each retained Niagara and Global as their exclusive financial advisors (respectively, the "AAOG Agreement" and the "KRH Agreement", collectively the "Advisor Agreements").[2] Niagara's rights under the Advisor Agreements were assigned to Camden pursuant to that Assignment and Assumption Agreement dated August 2, 2017 (the "Assignment").[3] Under the Advisor Agreements and pursuant to the Assignment, AAOG and KRH are obligated to pay Camden more than $4 million in fees due and owing to Niagara following two September 2016 transactions that refinanced more than $130 million of the Debtors' senior and subordinated debt (collectively, the "September 2016 Transactions").

3. Kern Cal Oil 7, LLC ("KCO"), an alleged secured creditor of the Debtors, filed its Motion to Estimate Camden Financial Services' Claim (the "Motion") [Docket No. 245] in which the Debtors filed a Joinder (the "Joinder") [Docket No. 259]. Although no objection to the Camden Claims has been filed, both the Motion and the Joinder assert defenses against the Camden' Claims which are premised upon the Debtors' legally unfounded allegations[4] and are incapable of exonerating the Debtors of liability for their breaches of the AAOG and KRH Agreements as a matter of controlling California law.[5] Accordingly, and due to the fact that the Motion is merely an estimation of the Camden Claims that has been set on an expedited basis, Camden seeks a summary adjudication denying such unfounded affirmative defenses and a corresponding estimation of its claims in full. Such disposition is compelled by the applicable

---

[2] *See* **Ex. 1** [AAOG Agreement] and **Ex. 2** [KRH Agreement], attached hereto. From March 2014 to September 2015, Niagara and Cappello Global, LLC ("Global"), in their capacity as AAOG's and KRH's exclusive financial advisor, successfully recapitalized approximately $230 million in debt that was owed by those entities. As a result of those efforts, Niagara was contractually entitled to receive, and was paid, approximately $7.6 million in fees, representing less than 4% of the value of the financial transactions it closed.
[3] *See* **Ex. 9** [Assignment] attached hereto.
[4] *See* Joinder filed on January 16, 2019 [Dkt. No. 259], at pp.5-8.
[5] *See* **Ex. 1** [AAOG Agreement] at p. 16, Appendix A at § 5; and **Ex. 2** [KRH Agreement] at p. 15, Appendix A at § 5, expressly providing that the AAOG and KRH Agreements are "governed by and construed in accordance with the laws of the state of California, without regard to its choice of laws provisions."

law and will have the practical benefit of eliminating unnecessary expense to the Debtors' estates. Further, efficiently estimating the Camden Claims in their appropriate full amount will facilitate the proper administration of Debtors' reorganization proceedings.

## FACTUAL BACKGROUND

### A. The AAOG Agreement

4. On February 20, 2014, AAOG entered into the AAOG Agreement, pursuant to which it jointly retained Niagara and Global to serve as AAOG's exclusive "Advisor" with respect to a wide range of financial transactions involving AAOG and its related entities, including, without limitation, KRH (collectively defined in the AAOG Agreement as the "Company"), for an initial term of no less than three years.[6] The AAOG Agreement set forth detailed schedules identifying the fees that AAOG was required to pay Niagara upon the closing of any "Transaction" during the term of that Agreement, including, without limitation, a "restructuring" of the Company's debt with its then-largest creditor, Chambers Energy Management, L.P. ("Chambers"), and a "recapitalization [] involving the issuance of any indebtedness or securities by the Company" to a "Covered Party," defined as any person or entity "introduced or identified by or on behalf of Advisor or Company, or who is in contact with or is contacted by Advisor or the Company during the Term of the [AAOG] Agreement."[7] As clearly established by the following provisions, the AAOG Agreement expressly prohibited AAOG from using any third-party to perform financial advisory services, or to avoid its contractual payment obligations to Niagara:

- "no other financial advisor [was] or [would] be authorized by [the Company] during the Term of [the AAOG] Agreement to perform services on the Company's behalf of the type described hereunder or which Advisor is otherwise authorized to perform [under the AAOG Agreement]";

---
[6] *See* **Ex. 1** [AAOG Agreement] at pp. 1-3, 6.
[7] *Id.* at pp. 1-5, 10-11, 13.

- "[n]o fee payable to any other financial, legal, or other advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable [under the AAOG Agreement] to Advisor, except as otherwise agreed to in writing by Advisor"; and

- the Company would "not engage in discussions regarding a Transaction except through Advisor."[8]

### B. The Chambers Transaction

5. After entering into the AAOG Agreement, Niagara—together with licensed personnel affiliated with Global authorized to offer broker dealer services on behalf of Niagara (collectively, the "Global-Affiliated Niagara Representatives")—rendered financial advisory services resulting in Chambers loaning $50 million to KRH on or about March 10, 2014, which proceeds were then used by KRH to buy-out Chambers' stock-purchase warrants and royalty interests in KRH's oil production (the "Chambers Transaction"). As a result of the closing of the Chambers Transaction, Niagara was contractually entitled to, and was paid, a $1.05 million fee.

### C. KRH's Separate Retention of Niagara and Global as Its Exclusive Financial Advisor

6. Following the close of the Chambers Transaction, the Debtors' Secretary and General Counsel sent the Global-Affiliated Niagara Representatives an email on March 10, 2014, requesting their preparation of "a new/supplemental engagement letter" for KRH's separate execution.[9] In response, Niagara and Global prepared and entered into the KRH Agreement, which KRH executed on or about April 9, 2014. Like the AAOG Agreement, the KRH Agreement also:

- Provided that, for a minimum term of three years, Niagara and Global would serve as KRH's *exclusive* "Advisor" with respect to a wide range of financial "Transactions" involving KRH, "its subsidiaries and affiliates and the respective entities that any one of them forms or merges into, that acquires such entity or in which it invests" (collectively defined in the KRH Agreement as the "Company"),

---

[8] *Id.* at p. 3.
[9] *See* **Ex. 3** [3/10/14 email from D. Katz to R. Deutschman] (emphasis added).

including, without limitation, a "recapitalization [] involving the issuance of any indebtedness or equity securities by [KRH]," or "the sale of the Company" to a "Covered Party";[10]

- Set forth detailed schedules specifying the fees that KRH was required to pay to Niagara upon the closing of different types of "Transactions";[11]

- Provided that that "no other financial advisor [was] or [would] be authorized by [KRH] during the Term of [the KRH] Agreement to perform services on [KRH's] behalf of the type described hereunder or which Advisor [was] otherwise authorized to perform [under the KRH Agreement]";[12] and

- Provided that (i) the payment of a fee to any other legal, financial or other advisor would not "reduce or otherwise affect the fees payable [under the KRH Agreement] to Advisor, except as otherwise agreed to in writing by Advisor;" and that (ii) during the Term of the KRH Agreement, KRH was prohibited from engaging in any "discussions regarding a Transaction except through Advisor."[13]

Consistent with its separate and distinct nature, and in contrast to the AAOG Agreement which was executed only by AAOG's President, Robert Morris, the KRH Agreement was executed by KRH's President, Robert Shore, alone.[14]

### D. The Recapitalization of KRH's Chambers Debt

7. On or about October 6, 2014, Niagara and the Global-Affiliated Niagara Representatives recapitalized KRH's debt with Chambers by replacing it with $131 million in senior secured financing obtained from GE Capital (the "GE Debt"), which was used to pay-off the Chambers debt in its entirely (the "GE Transaction"). As a result of the closing of the GE Transaction, Niagara was contractually entitled to, and was paid, a $4,002,500 fee.

### E. The First Recapitalization of the GE Debt

8. On or about May 19, 2015, GE exercised its right under the GE Transaction to make a "borrowing base redetermination," pursuant to which it demanded that KRH repay $20

---

[10] *See* **Ex. 2** [KRH Agreement] at pp. 1-3, 5, 12.
[11] *Id.* at pp. 3-4, 9-10.
[12] *Id.* at p. 3.
[13] *Id.*
[14] *See and compare* **Ex. 1** [AAOG Agreement] at pp. 9, 17; and **Ex. 2** [KRH Agreement] at pp 8, 17.

million of the GE Debt (the "First GE Repayment Demand"). Less than four months later on or about August 31, 2015, Niagara and the Global Affiliated Niagara Representatives obtained financing in the form of a $50 million second lien loan from Alliance Bernstein Private Credit Investors L.P. ("AB"), $45 million of which was used to satisfy GE's repayment demand and to further pay down the GE Debt. As a result, Niagara was contractually entitled to, and was paid, a $2,187,500 fee.

### F. The Debtors Improperly Retain Third-Party Consultants for the Admitted Purpose of Attempting to Avoid Their Contractual Payment Obligations to Niagara

9. On or about May 4, 2016, GE exercised its rights to make a second borrowing base redetermination and demanded that KRH repay an additional $15 million in loan principal (the "Second GE Repayment Demand"), requiring KRH to again seek financing.

10. In June 2016, the Debtors retained the son of an AAOG Board member, Kip Ferguson, and his partner, Chris Ryals, as third-party financial consultants to respond to the Second GE Repayment Demand, in direct violation of the AAOG and KRH Agreements' exclusivity provisions (collectively, the "Improperly Retained Consultants"). As confirmed by the express written *admissions* made in the Debtors' Report of the Special Committee of the Board of Directors provided to AAOG's shareholders on or about April 7, 2017 (the "AAOG Special Report"), the Debtors engaged the Improperly Retained Consultants for the specific purpose of attempting to circumvent their respective Advisor Agreements with Niagara, and avoid paying any fees to Niagara in connection with any "Transaction" refinancing KRH's debt. Thus, as expressly admitted by the Debtors in the AAOG Special Report:

> 1. On June 15, 2016, AAOG and KRH agreed to engage the Improperly Consultants as "strategic advisors" for a period of six-months, during which the Improperly Retained Consultants would receive (i) collective monthly fees of $300,000, plus (ii) a minimum "Cash Bonus" of $300,000 upon the completion of the "short-term and medium-term objectives" outlined in the parties' consulting agreements, which

objectives (iii) "were all intended to assist AAOG in accomplishing the overarching goal of achieving a debt restructuring to ameliorate the issues caused by the GE Default Notice[,]" and (iv) specifically included "[a]mending the existing capital structure with lending group . . . , [identifying] [n]ew equity and/or debt capital partners" and "[n]egotiat[ing] directly with Company's lenders in an efforts to complete a restructuring of the existing capital structure including the Company's hedges[.]";

   2. The Improperly Retained Consultants were engaged because "AAOG's directors and officers were eager to . . . diversify [AAOG's] approaches to identifying potential financing and liquidity solutions," and "[a]t the same time . . . , were also concerned about the fees and costs the Company would incur as a result of, and in potentially curing, the [GE] Default Notice, because, when AAOG had received a prior and similar borrowing base deficiency noticed issued by GE Capital in May 2015—only one year earlier—the Company paid in excess of $2 million to its outside financial advisor [Niagara] to negotiate a refinancing with the Company's existing lenders in order to resolve the notice of default.";

   3. Following their engagement, AAOG's President, Robert Morris, "directed that the Consultants lead the financing efforts[,]" leading to "a series of formal and informal meetings with financial institutions and other potential sources of financing.";

   4. Between July and September 2016, "the Consultants were also continuously involved in extensive negotiations with [AB] and Goldman, Sachs & Co. ('Goldman'), the Company's second-lien lenders, and . . . these negotiations ultimately resulted in a restructuring of the Company's debt [in September 2016][,]" whereby "the second-lien holders [AB and Goldman] would ultimately replace GE Capital and Fortress as the first-lien holders . . . . [and] [KRH] also entered into a second-lien credit facility with AB and Goldman."; and

   5. The Improperly Retained Consultants "were each paid $150,000 for a total [bonus] of $300,000, on October 3, 2016[,]" and the collective $600,000 they received from AAOG was "far less than the over $2 million paid to the Company's outside financial [advisor] [Niagara] in connection with the May 2015 borrowing base deficiency default notice issued by GE Capital . . . ."[15]

### G. The Debtors' Failure and Refusal to Pay Niagara its Contractually Required Fees

11. From June to September 2016, the Improperly Retained Consultants participated in, and excluded Niagara and the Global-Affiliated Niagara Representatives from, negotiations with AB, as well as with other potential lenders, regarding the refinancing of the GE Debt in response to the GE Second Repayment Demand. On or about September 14, 2016, the Debtors

---

[15] *See* **Ex. 4** [AAOG Special Report] at pp. 4-11.

approved term sheets for the September 2016 Transactions with AB, pursuant to which AB would replace GE as KRH's first lien lender, and would refinance AB's existing second lien loan to KRH.

12. Among other things, the September 2016 Transactions (i) replaced GE's first lien loan to KRH with a senior credit facility from AB that was secured by AAOG's assets and was subject to a new interest rate, new maturity date, new financial covenants, and a modified amortization schedule; (ii) refinanced AB's second lien loan with a new interest rate and new maturity date; (iii) awarded AB warrants to purchase up to 25% of AAOG's stock; and (iv) granted AB the right to convert its first and second lien loans into a unitranche structure.

13. Pursuant to the express terms of the AAOG and KRH Agreements, the September 2016 Transactions each constituted a separate "Transaction" entitling Niagara to the payment of fees totaling $4.162 million. Specifically: **(a)** The replacement of GE's first lien loan to KRH constituted a "Recapitalization" of $87.6 million in senior debt with no equity component, contractually entitling Niagara to a transaction fee of **$1.908 million** under Schedule C of the AAOG and KRH Agreements; and **(b)** The refinancing of AB's second lien loan constituted a "Recapitalization" of $51.673 million in subordinated debt, contractually entitling Niagara to a transaction fee of **$2.254 million** under Schedule B of the AAOG and KRH Agreements. Although the Debtors paid the Improperly Retained Consultants $600,000 for their performance of advisory services related to the September 2016 Transactions, they Debtors failed and refused to pay any portion of the $4.162 million in fees contractually owed to Niagara.

H. **The Debtors' Attempt to Unilaterally Terminate the KRH Agreement and Their Attempted Secret Sale**

14. After the close of the September 2016 Transactions, the Debtors requested that Niagara and the Global-Affiliated Niagara Representatives help procure equity financing that, if

obtained, would result in the cancellation of AB's remaining warrants to purchase AAOG's stock.  Niagara and the Global-Affiliated Niagara Representatives agreed to do so but, in light of the outstanding fees due on the September 2016 Transactions, requested that the Debtors remit an *advance* payment of $350,000 unrelated to the outstanding fees owed to Niagara on the September 2016 Transactions prior to their commencement of such work.  In response, KRH paid Niagara a $100,000 "Consulting" fee on November 15, 2016, and a $250,000 "Consulting" fee on December 14, 2016 (collectively, the "New Transaction Advance Consulting Fees").[16]

15. After receiving the New Transaction Advance Consulting Fees, Niagara and the Global-Affiliated Niagara Representatives worked to locate and procure new financing. However, on February 10, 2017, the Debtors' Secretary and General Counsel sent a letter which not only purported to unilaterally terminate the KRH Agreement in violation of its express terms, but also further revealed—for the first time—that the Debtors were engaged in undisclosed negotiations to sell AAOG, in direct violation of Niagara's and Global's exclusive rights and financial advisor status under the AAOG Agreement.[17]  On February 14, 2017, the Debtors' Secretary and General Counsel retracted their attempted termination of the KRH Agreement, and notified Niagara and the Global-Affiliated Niagara Representatives that KRH now would not renew the KRH Agreement upon its expiration (the "Retraction Letter").  The Retraction Letter directed Niagara to "take no further actions on [KRH's] behalf and to do no further work pursuant to the [KRH] Agreement," and expressly acknowledged and agreed that the "failure to take such actions and do such work" did not waive any of Niagara's rights under the KRH Agreement, "all of which [were] expressly reserv[ed]."[18]

---

[16] *See* **Ex. 5** [11/15/16 and 12/14/16 New Transaction Advance Consulting Fees invoices].
[17] *See* **Ex. 6** [Attempted Termination Letter].
[18] *See* **Ex. 7** [Retraction Letter].

# ARGUMENT

## I. The Debtors' Proffered Defenses to Payment of the Contractually Required Fees Due and Owing to Niagara are Legally Meritless

16. As set forth in their Joinder, the Debtors proffer and rely upon the following alleged legal defenses (collectively, the "<u>Alleged Defenses</u>") in response to the legally dispositive provisions of the AAOG and KRH Agreements entitling Camden to the relief requested in the Camden Claims:

> (1) That Niagara orally agreed to accept $350,000 from the Debtors in final accord, satisfaction and settlement of its $4.126 million fee entitlement, which alleged agreement was neither reduced to, nor is reflected in, any writing (the "<u>Alleged Accord and Satisfaction Defense</u>");
>
> (2) That Niagara and Global fraudulently induced the Debtors to enter into the AAOG and KRH Agreements in February and March 2014, respectively, by allegedly concealing publicly available court records concerning litigation involving non-parties to each of those agreements (the "<u>Alleged Fraudulent Inducement Defense</u>");
>
> (3) That the Debtors did not hire the Improperly Retained Consultants as "advisors" to negotiate the September 2016 Transactions, and that even if they did, the September 2016 Transactions allegedly did not constitute "Transactions" under the AAOG and KRH Agreements because they purportedly consisted of AB simply exercising its contractual right—pursuant to an Intercreditor Agreement with GE—to purchase GE's first lien debt (the "<u>Alleged First Lien Swap Defense</u>"); and
>
> (4) That AAOG is not responsible for any fees due and owing on the September 2016 Transactions because the KRH Agreement allegedly superseded and rendered the AAOG Agreement legally obsolete (the "<u>Alleged Supersession Defense</u>").[19]

As established below, each of the Alleged Defenses is incapable of exonerating the Debtors of liability for their breaches of the AAOG and KRH Agreements as a matter of controlling California law.

---

[19] *See* Joinder at p. 3, ¶ 3.

### 1. The Debtors' Alleged Accord and Satisfaction Defense is Legally Baseless and Required to be Denied.

17. In direct contradiction of (i) the provisions on the face of the AAOG and KRH Agreements expressly prohibiting and precluding oral modifications;[20] and despite (ii) the complete absence of any written agreement notwithstanding the direct involvement and representation at all relevant times by their Secretary and General Counsel, the Debtors' Alleged Accord and Satisfaction Defense baldly asserts that Niagara and Global *orally* agreed in late 2016 "to forego any fees due to Niagara in connection with the [September] 2016 [T]ransaction[s] in exchange for payment by KRH of [the] $350,000" invoiced for the New Transaction Advance Consulting Fees.[21] In addition to being belied by the express terms of the AAOG and KRH Agreements themselves, the Debtors' Alleged Accord and Satisfaction Defense also is legally incapable of exonerating them of liability for their breach of those agreements.

18. Specifically, governing California law is clear that an accord and satisfaction defense requires proof "that the debtor made it clear that acceptance of what he tendered was subject to the condition that it was to be in full satisfaction of the creditor's unliquidated claim," and "that the creditor clearly understood when accepting what was tendered that the debtor intended such remittance to constitute payment in full of the particular claim in issue." *Bii Fin. Co. v. U-States Forwarding Servs. Corp.*, 95 Cal. App. 4th 111, 126-127 (2002). To that end, California law is equally clear that "it must appear '*in express terms*' that the payment is intended as a full satisfaction of the disputed account[,]" and "there must be a *definite indication* either on the check or in the accompanying letter that it is intended as full payment of a disputed claim." *Biaggi v. Sawyer*, 75 Cal. App. 2d 105, 114 (1946) (italics in original).[22]

---

[20] *See* **Ex. 1** [AAOG Agreement] at p. 8, **Ex. 2** [KRH Agreement] at p. 7.
[21] *See* Joinder at p. 5, ¶ 7.
[22] *See also, e.g., Messer v. Tait's, Inc.*, 121 Cal. App. 698, 701 (1932) (holding that there is no accord and

19. Here, the *only* documents allegedly supporting the Debtors' Alleged Accord and Satisfaction Defense—emails from their Secretary and General Counsel requesting invoices for the New Transaction Advance Consulting Fees, and the invoices for the New Transaction Advance Consulting Fees themselves—indisputably do not contain the legally required, unambiguous statement that the Debtors' payment of those invoices remotely related to, much less were made in complete satisfaction of, Niagara's entitlement to its contractually mandated $4.126 fee on the September 2016 Transactions.[23] To the contrary, those invoices establish—on their face—that the Debtors' payment of the New Transaction Advance Consulting Fees pertained exclusively to "Consulting Services," falling well-short of what is legally required to establish an accord and satisfaction defense, particularly given the parties' admitted financial sophistication and the significant amount of money in dispute. *See Golden West Baseball Co. v. City of Anaheim*, 25 Cal. App. 4th 11, 48 (1994) ("no reasonably sophisticated business person would rely upon oral pronouncements . . . in lieu of written permission.").[24]

---

satisfaction as a matter of law unless the instrument of payment "upon its face contained a statement that it was in full payment or unless the offer was clearly in some unequivocal way made upon such condition."); *Berger v. Lane*, 190 Cal. 443, 451-452 (1923) ("In all the cases that have been called to our attention in which a satisfaction has been held to have been conclusively expressed in writing, the writing in some form shows without question that the acceptance of the [e]nclosure was clearly intended to be a satisfaction in full of the claim. This sometimes is shown by the express words used in the body of the check or by an accompanying receipt stating that the amount sent is in full of all demands. Of course, the statements, declarations, and acts of the parties are to be considered and weighed in arriving at the understanding of the parties, but they must be of such a character as to express in a clear manner the intention of the parties to be affected. Neither the language of the receipt nor the check here involved can be said to be conclusive on the case at bar."); 1 California Jurisprudence 3d Accord and Satisfaction, Compromise, Settlement and Release at §§ 17 ("However, if the debtor's intention that a check is to be in full payment is undisclosed either in the check or in the accompanying letter, it cannot bind the creditor. Thus, if the intention is not clearly communicated to the creditor with the remittance, there is no accord and satisfaction as a matter of law even if the creditor retains and uses the remittance."); 18 ("A tender accompanied by vague or indefinite terms which do not clearly identify that the offer or tender is conditioned on acceptance constituting payment in full is insufficient to establish an accord and satisfaction.").

[23] *See* **Ex. 5** [11/15/16 and 12/14/16 Invoices]; **Ex. 8** [11/15/16 email between R. Deutschman and D. Katz].

[24] *See also In re Brueckner*, 147 B.R. 685, 687 (Bankr. W.D. Pa. 1992) (holding that it was "implausible" and "defie[d] belief" that an "experienced and sophisticated [debtor]" would have relied on an "oral agreement" not to seek contribution against a co-obligor where the parties had entered into a written agreement concerning that same subject matter).

### 2. The Debtors' Alleged Fraudulent Inducement Defense is Equally Meritless.

20. The Debtors' Alleged Fraudulent Inducement Defense—premised upon Niagara's and Global's alleged failure to disclose publicly available court records pertaining to unrelated litigation exclusively involving *Cappello Capital Corp.* ("Capital"), an admitted *non-party* to the AAOG and KRH Agreements, more than two years earlier (the "Prior Capital Action")[25]—is similarly incapable of exonerating the Debtors for their breach of those agreements. That is because governing California law is clear that a claim for fraudulent inducement is not legally viable where, as here, the alleged misrepresentations or omissions have no bearing on the value of the goods or services exchanged under the parties' agreement. Thus, as plainly stated in and established by the following representative authorities:

- *Service by Medallion, Inc.,* 44 Cal. App. 4th 1807, 1818-1819 n. 2 (1992) (finding that "[v]iewed in terms of materiality, [a] false representation which cannot possibly affect the intrinsic merits of a business transaction *must necessarily be immaterial* because reliance upon it could not produce injury in a legal sense," and holding that the trial court properly dismissed the plaintiff's action because even if the defendant's alleged misrepresentation concerning its intent to maintain a non-unionized facility induced plaintiff to enter a contract to perform services for defendant, that misrepresentation "had no effect on the value of the bargain [plaintiff] received[,]" namely payment for services rendered) (emphasis added);

- *Hill v. Wrather*, 158 Cal. App. 2d 818, 822-824 (1958) (rejecting proposition that a party can adequately plead fraud based on misrepresentations having "no bearing upon the value of either the property or the services bargained for," and finding that: "The essence of [cross-complainants'] charge of fraud is that they were induced to enter into these two related transactions in reliance upon an alleged representation that [cross-defendants] were not married to each other. It is asserted that by virtue of this false representation and the concealment of the intimate personal relationship . . . , [cross-complainants] thought they were dealing with two independent individuals whose relationship had been, and was at that time, purely a business one. [They] further allege that had they known the true relationship between [cross-defendants], they would not have [entered the transactions at issue purchasing one cross-defendant's stock and increasing the other cross-defendant's share of the company in exchange for her management of the business]. The allegedly concealed and misrepresented relationship between

---
[25] *See* Joinder at pp. 6-7, Section III.

[cross-defendants] must be regarded as *wholly collateral and immaterial* since it had no bearing upon the value of either the property or the services which [cross-complaints] bargained for. There is no allegation in [the] pleadings, nor any suggestion in their briefs, that the value of the stock which they acquired was less than they paid for it or that [the cross-defendant] failed in any respect to perform faithfully and competently the services that she was expected to perform in the management of the business. *A false representation which cannot possibly affect the intrinsic merits of a business transaction must necessarily be immaterial because reliance upon it could not produce injury in a legal sense*.") (emphasis added).

21. Consistent with controlling California law, the Prior Capital Action is legally incapable of relieving the Debtors of their contractual payment obligations on the September 2016 Transactions. Indeed, the Debtors do not even attempt to allege that the Prior Capital Action had any effect upon the legality or quality of the investment banking services Niagara and the Global-Affiliated Niagara Representatives rendered under the AAOG and KRH Agreements. Nor could they ever legally do so, particularly where Niagara's and the Global-Affiliated Niagara Representatives' provisions of those services indisputably resulted in the recapitalization of $230 million of the Debtors' debt from March 2014 to September 2015, and correspondingly maintained the Debtors' solvency for years despite their corporate mismanagement and declining oil prices.

### 3. The Alleged First Lien Swap Defense Also is Legally Meritless.

22. The Debtors' Alleged First Lien Swap Defense rests on two demonstrably false premises: that (i) the Debtors supposedly did not hire the Improperly Retained Consultants as "advisors" to negotiate the September 2016 Transactions; and that (ii) the September 2016 Transactions allegedly did not constitute new "Transactions" under the AAOG and KRH Agreements.[26] Neither contention can withstand scrutiny.

---

[26] *See* Joinder at pp. 7-8, Section IV.

23. First, the falsity of the Debtors initial premise is established by, and manifest in, the admissions contained in the AAOG Special Report, which, among other things, confirm that the Debtors hired and paid the Improperly Retained Consultants to serve as the Debtor's "*strategic advisors*" for the express purpose of "*assist[ing] AAOG in accomplishing the goal of achieving a debt restructuring to ameliorate the issues caused by the GE Default Notice*[,]" and in a conceded attempt to avoid paying Niagara "*the fees and costs the Company would incur as a result of, and in potentially curing, the [GE] Default Notice*."[27]

24. Second, the falsity of the Debtors' remaining premise is established by the plain language of the AAOG and KRH Agreements themselves under which the Debtors were required to pay Niagara specified fees upon the closing of *any* "Transaction" during the terms of those Agreements.[28] Here, it is indisputable that the September 2016 Transactions closed prior to the expiration of the minimum three-year terms of the AAOG and KRH Agreements, and that, under the express terms of those agreements, the September 2016 Transactions consisted of two separate and distinct "Transactions[,]" each entitling Niagara to a separate fee.[29] Specifically, AB's replacement of GE's first lien debt constituted a "Recapitalization" of $87.6 million in *senior* debt with no equity component, while AB's second lien debt constituted a "Recapitalization" of $51.673 million in *subordinated* debt, respectively entitling Niagara to fees of $1.908 million and $2.254 million. Under governing California law, where, as here, "contract

---

[27] *See* **Ex. 4** [AAOG Special Report] at pp. 5, 7-11 (emphasis added).

[28] *See* **Ex. 1** [AAOG Agreement] at pp. 4-6 (requiring the payment of fees to Niagara upon the "Closing" of *any* "Transaction" with *any* "Covered Party" during, or within two years after the expiration or termination of, the Agreement); **Ex. 2** [KRH Agreement] at pp. 3-5 (same).

[29] In confirmation of those facts, both the AAOG and KRH Agreements expressly contemplated and provided that a "Recapitalization" not only could occur as a "stand alone Transaction *or* in connection with a related Transaction[,]" but also expressly distinguished between senior and subordinated debt "Recapitalizations." *See* **Ex. 1** [AAOG Agreement] at pp. 2 (defining a "Recapitalization" as a transaction involving the "issuance of any indebtedness or equity securities by the Company to a Covered Party . . . whether as a standalone Transaction or in connection with a related Transaction."); 4-5 (defining the fees payable upon the "Closing" of different types of "Recapitalization[s] either as a separate Transaction or in conjunction with another Transaction"); **Ex. 2** [KRH Agreement] at pp. 2, 4 (same).

language is clear and explicit and does not lead to absurd results, [courts] ascertain intent from the written terms and go no further." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 524 (2003) (internal quotation marks omitted).

25. Third, the contention that September 2016 Transactions did not constitute new "Transactions" further is belied by the Debtors' own written *admissions* to their shareholders establishing that:

- the Debtors wanted to avoid using Niagara and the Global-Affiliated Niagara Representatives to negotiate a refinancing transaction with AB precisely because there allegedly would not be sufficient funds to pay the contractually required fees on such a transaction;[30]

- AB's purchase of GE's loan "*was an outcome that was by no means assured*," and therefore required the use of outside financial advisors;[31] and

- the September 2016 Transactions "resulted in . . . <u>*new* amortization payments on *both* [first and second lien] credit facilities</u>, <u>*new* loan covenants and interest rates on *both* credit facilities</u>, and [*new*] warrants being issued to AB/GS to purchase AAOG stock."[32]

As established by their own documents and admissions, the Debtors' Alleged First Lien Swap Defense is legally baseless.

### 4. The Alleged Supersession Defense Similarly is Legally Baseless.

26. In a final attempt to avoid the consequences of their contractual breaches, the Debtors' Alleged Supersession Defense asserts that Niagara's fee entitlement is only enforceable against KRH because the KRH Agreement allegedly superseded and legally obviated the AAOG Agreement. Even putting aside the inalienable facts that the KRH Agreement not only omits any supersession language whatsoever, but also was separately executed in the name of KRH alone, the Debtors' Alleged Supersession Defense is legally precluded by the dispositive law holding

---

[30] *See* **Ex. 4** [AAOG Special Report] at p. 9.
[31] See *id.* (emphasis added).
[32] *See id.* at pp. 8-9 (emphasis added).

that as a subsidiary, KRH cannot modify the contractual obligations of its parent corporation, AAOG, absent an alter ego relationship between those companies. *See, e.g., Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 305 (2018) (absent an alter ego relationship, a parent corporation and its subsidiary are "distinct" legal entities that are not responsible for, or affected by, each other's acts).[33] Accordingly, the Debtors' Alleged Supersession Defense fails as a matter of law absent the existence of an alter ego relationship between AAOG and KRH, which relationship the Debtors necessarily and expressly deny in proffering that defense.

## CONCLUSION

27.     Camden requests that the Court grant summary judgment with respect to all affirmative defenses that the Debtors assert with respect to the Camden Claims. With no affirmative defense legally cognizable against them, and no dispute as to their contractual basis, the Camden Claims are required to be estimated in the full amount as filed.

Dated: January 28, 2019.

---

[33] *See also, e.g., Maltz v. Union Carbide Chemicals & Plastics Co., Inc.*, 992 F. Supp. 286, 300 (S.D.N.Y. 1998) ("Generally, parent and subsidiary corporations are treated as separate legal entities, and a contract by one does not legally bind another."); *T&S Prods. v. United States*, 48 Fed. Cl. 100, 111 (2000) ("It is a 'well established principle that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both . . . .'").

Respectfully submitted,

JACKSON WALKER L.L.P.
112 East Pecan, Suite 2400
San Antonio, Texas 78205
(210) 978-7700 – Telephone
(210) 978-7790 - FAX

/s/ *Jennifer F. Wertz*
J. Scott Rose
State Bar No. 17252800
(210) 978-7760 – Direct Dial
(210) 242-4645 – Direct Fax
Email address: srose@jw.com

Jennifer F. Wertz
State Bar No. 24072822
100 Congress Avenue, Suite 1100
Austin, TX 78701
(512) 236-2247 – Direct Dial
(512) 391-2147 – Direct Fax
Email address: jwertz@jw.com

PEPPER HAMILTON LLP
4 Park Plaza, Suite 1200
Irvine, California 92614-5955
(949) 567-3528
(866) 224-0916 – FAX
Alan J. Kessel (admitted *pro hac vice*)
CA State Bar No. 130707
Email Address: kessela@pepperlaw.com
Kay S. Kress (admitted *pro hac vice*)
MI State Bar No. P39339
Email Address: Kressk@pepperlaw.com

**COUNSEL FOR CAMDEN FINANCIAL SERVICES**